IN THE

# SUPREME COURT OF NEBRASKA.

## JANUARY TERM, 1881.

PRESENT:

Hon. SAMUEL MAXWELL, Chief Justice.
" GEORGE B. LAKE, } Judges.
" AMASA COBB,

I. P. Olive and Frederick Fisher, Plaintiffs in Error,
v. The State of Nebraska, Defendant in Error.

1. **Constitutional Law.** By section eleven of the bill of rights, Constitution of 1875, all persons charged with crime are entitled to "a speedy public trial, by an impartial jury of the *county* or *district* in which the offense is alleged to have been committed."

2. ——: of the word "district," as here used. The word "district," like the word "county," is here used in a restrictive sense, to limit and control the exercise of both legislative and judicial power in the punishment of criminal offenders. It is intended to designate the precise portion of territory or division of the state over which a court, at any particular sitting, may exercise power in criminal matters. And such division, by whatever name it is known in legislation, is co-extensive with,

3

11 — 1
12 — 382
12 — 388
16 — 358
17 — 154
20 — 237
20 — 245

11 — 1
29 — 445

11 — 1
32 — 169

11 — 1
34 — 252

11 — 1
38 — 868

11 — 1
40 — 19
40 — 319
40 — 762
41 — 539

11 — 1
43 — 21

11 — 1
46 — 181
46 — 402
46 — 611

11 — 1
45 — 276

11 — 1
47 — 643

11 — 1
52 — 430
53 — 303
55 — 394

11 — 1
60 — 530

11 — 1
61 — 553

and practically limited by, this constitutional provision, to that from which a jury, for the particular term, may legally be drawn.

3.  ———: POWER OF THE LEGISLATURE TO CREATE TRIAL DISTRICTS. While the legislature doubtless may, in their discretion, by general law, create trial districts larger than a single county, yet, to be effective, such law must be accompanied by one under which jurors can be called from the whole, and not merely from a portion of such district.

4.  ———: DESIGN OF THIS CONSTITUTIONAL PROVISION. The grand design of this constitutional provision seems to be to secure to the accused a trial by a jury from the vicinage where the crime is supposed to have been committed, so that he may have the benefit of his own good character and standing with his neighbors, if these he has preserved, and also of such knowledge as the jury may possess of the witnesses who give evidence before them.

5.  ———: POWER OF THE LEGISLATURE TO ORGANIZE NEW COUNTIES. There is nothing in the constitution prohibiting the formation of new counties out of the unorganized territory of the state, of such form and dimensions as to the legislature may seem best.

6.  ———: EFFECT OF FORMING AND ORGANIZING NEW COUNTY OUT OF UNORGANIZED TERRITORY, FORMERLY PORTIONS OF TWO JUDICIAL DISTRICTS. When a new county, formed by the legislature from "unorganized territory" taken from two judicial districts, becomes organized for county purposes, as the statute directs, it thereupon ceases to be "unorganized territory," and is entitled to all the rights and privileges, under the constitution, bestowed upon these governmental divisions of the state. Its territory is no longer divided between the two judicial districts, but is completely severed from both, and of necessity must so remain until the legislative duty of assigning it to one of them is performed. Under the constitution a county cannot be parts of two judicial districts.

7.  Statute Law: MEANING OF THE TERM "UNORGANIZED COUNTY." By the term "unorganized county," in the act of Feb. 24th, 1879, "To authorize the judge of the district court to designate the county where an indictment may be found," etc., is meant simply a county which has not become organized for local government under the statute providing how that may be done. The act above referred to contemplates no such thing as a county unorganized "for judicial purposes," for when a

Olive v. The State.

county becomes organized under the law, it is so for all known purposes of civil administration—judicial as well as other.·

8. **District Courts:** OF THEIR CRIMINAL JURISDICTION. A district court while sitting in one county has no jurisdiction over crimes committed in other organized counties.

9. **Change of Venue in Criminal Cases.** Under the statute, an application by a prisoner for a change of the place of trial is addressed to the sound discretion of the trial court, and unless an abuse of such discretion be clearly shown, the decision will not be interfered with. A motion for such change to a particular county is bad, and may be overruled for that reason alone.

10. **Jurors:** COMPETENCY OF: IMPRESSION OF GUILT. If it be shown by the *voire dire* examination of a juror that his mind is impressed so thoroughly with the idea of the prisoner's guilt that he cannot presume him to be innocent, and can only admit the "possibility" of his being so, it is good ground for challenge.

11. ————: OPINION BASED ON NEWSPAPER REPORTS. And if a juror have an opinion as to the guilt of the accused, even if based solely on newspaper reports, so fixed as to require evidence to remove it, he does not stand indifferent, and is subject to challenge, although he may believe that he can render a fair and impartial verdict on the evidence produced in court.

12. **Interested Witness:** HIS CROSS-EXAMINATION. Any interest that a witness may have in the result of the trial of a case in which he is testifying; whether pecuniary or other, may be called out on his cross-examination, as affecting his credibility.

13. **Cross-examination of Witness as to Identity of Prisoner.** A witness for the state who had testified, on his direct examination, to having seen a person he took for one of the prisoners near the place of the murder, on the evening preceding the night of its commission, was asked, on cross-examination, how long he had known him, and answered, "Since he has resided in Plum Creek." He was then asked, "How long has he resided there?" and "Have you known him well since he lived there?" These questions were both excluded on the ground of immateriality. *Held*, error.

14. **Refusal of Court to hear Argument.** The refusal of a court to hear argument of counsel as to the admissibility of evidence is not, *per se*, error.

15. **Examination of Witnesses:** RULES RESPECTING. A court may make reasonable rules respecting the examination of witnesses, but no rule can be upheld that arbitrarily dictates which of several attorneys, there being no disagreement between them, shall examine or cross-examine a witness, or that requires the same attorney who took part in the examination in chief to conduct the cross-examination.

16. **Good Character:** EXAMINATION OF WITNESSES TO. Where a person accused of crime introduces evidence of his good character or reputation, it is not competent for the prosecution, in reply, to put in evidence particular facts tending to prove it to be bad. But if particular facts be admitted, either with or without objection, the accused has the right to show the circumstances under which they occurred.

17. ———. Good character may always be proved in criminal cases, no matter how heinous the offense charged. Still it may occur that the crime is so strongly marked by deliberation and atrocity that if the jury are clearly convinced the accused was a party to it, his good character should not avail.

18. **Charge to Jury.** The charge to a jury must not be so worded as to be liable to leave upon their minds an impression that the judge believes the prisoner guilty; nor should it have a tendency to confuse or mislead them.

19. ———: GOOD CHARACTER. An instruction by which the jury are given to understand that, by reason of being indicted and put upon trial, the character of the accused "*has a stain or imputation*" cast upon it, and that his proof of good character was "to remove this stain or imputation," and to restore the character to its former state, is erroneous.

20. ———: ———. The purpose of evidence of good character is to disprove guilt. But if the accused offer no evidence of his good character, no legal inference can arise from such omission that he is guilty of the offense charged, or that his character is bad.

21. ———: ACCOMPLICES. A charge to the effect that while it is unsafe to convict upon the testimony of an accomplice alone, the jury were at liberty to do so if, on due consideration, they deemed it sufficient, *held*, not erroneous.

22. ———. A court is not required to multiply instructions, with changed phraseology, on a single proposition of law. One clear, pointed statement to the jury of each proposition advanced is sufficient.

23. **Verdict.** In a case of homicide a verdict finding the accused guilty under a count of the indictment charging death to have been produced " by means to the jurors unknown," will be sustained, although there was evidence before the jury which would have warranted them in finding it to have been produced either by hanging or by shooting.

ERROR to the district court of Adams county.

The plaintiffs in error were indicted at a special term of the court called in that county, commencing February 25, 1879, for the murder of Luther Mitchell on the 10th day of December, 1878, in the county of Custer. On the 24th of February, 1879, the legislature passed the following act:

"An act to authorize the judge of the district court to designate the county where an indictment may be found, and the person tried for any felonious offense charged to have been committed in any unorganized county or territory of this state, or in any county where no district courts are held, and to provide for the payment of fees and expenses incurred in the arrest and prosecution of such persons, and to repeal an act entitled 'An act to authorize the judges of the district court to designate the county where an indictment may be found, and the person tried for any felonious offense charged to have been committed in any unorganized county, or in any county where no district courts are held,' approved February 25, 1875.

"*Be it enacted by the Legislature of the State of Nebraska:*

"SECTION 1. That it shall be lawful for the judge of any judicial district court within the state of Nebraska, where it has been made to appear to him that a crime has been committed amounting to a felony, within any unorganized county or territory, or in any county where no terms of the district court of this state are held, attached to or in his said district for judi-

cial or other purposes, to designate the county in his district wherein the alleged offense may be inquired into by the grand jury, and in case an indictment found, the person or persons so indicted, tried: *Provided*, nothing herein shall prevent the person or persons indicted, upon a legal and proper application, removing the trial thereof to some other county in the same judicial district; and, *provided further*, that all costs and expenses for the arrest and prosecution of such person or persons shall be paid out of the general fund of the state; and, *provided further*, that no bill for costs or expenses shall be audited and paid without the certificate of the presiding judge of said district, that said services have been performed, and that the account is correct.

"Sec. 2. Sections one and two of an act entitled 'An act to authorize the judges of the district court to designate the county where an indictment may be found, and the person tried for any felonious offense charged to have been committed in any unorganized county, or in any county where no district courts are held,' approved February 25, 1875, are hereby repealed.

"Sec. 3. There being an emergency for the taking effect of this act, the same shall take effect and be in force from and after its passage.

"Approved February 24, A.D. 1879"

On the 26th day of February, 1879, an order was made by the district judge, and entered of record, as follows:

Be it remembered, that on this 26th day of February, A.D. 1879, it having been made to appear to the Hon. William Gaslin, Jr., judge of the fifth judicial district of Nebraska, that a certain crime, amounting to a felony, to-wit, the murder of one Luther Mitchell, was committed on the 10th day of December, 1878, in the said so-called county of Custer, west of Sherman

county, and within the fifth judicial district of the state of Nebraska, and it appearing further that no terms of the district court have been or are now held in the said so-called county of Custer, and it further appearing that so-called Custer county is so situated geographically that under the constitution of this state that all that portion of said county of Custer lying west of Valley county is in the sixth judicial district of the state of Nebraska, and that all that portion of said Custer county lying west of Sherman county is in the fifth judicial district of the state of Nebraska, and it further appearing that no term of the district court can be called for a part of said so-called county, and that no district judge has jurisdiction over the entire county so-called aforesaid, it being in two separate and distinct judicial districts, and that said so-called Custer county, so far as holding terms of district court therein, is unorganized and not assigned to any county for judicial purposes: wherefore the county of Adams, in the fifth judicial district of the state of Nebraska, is hereby, by the judge of the said fifth judicial district, designated as the county wherein the alleged offense may be inquired into by the grand jury, and in case an indictment is found, the person or persons so indicted, tried.

In pursuance of the above act and the foregoing order, an indictment having been found by a grand jury in Adams county, plaintiffs in error were put upon their trial there, and a verdict of guilty of murder in the second degree having been returned by the jury, they were sentenced to imprisonment in the penitentiary for life. They then sued out this writ of error.

*Hinman & Neville*, *Mason & Whedon*, *James Laird*, and *Hamer & Conner*, for plaintiffs in error, contended, *inter alia*, 1. It is not within the power of the legisla-

ture and a district judge to prevent a trial in the county where the offense is alleged to have been committed. An offense is charged to have been committed in a duly organized county, with all its county officers engaged in the discharge of their official duties. But this county is assumed to lie half in the fifth judicial district, and half in the sixth, and on this assumption it is argued that it is not *judicially* organized. There is no such thing as a "judicial organization" of a county necessary to its creation. A county is one creature of the law and a court is another, and a county may exist separately and independently of a court. The use of the word "district" in lieu of the word "circuit" may tend to produce confusion, but should not when we remember that it means the same thing—the counties where the judge may hold his courts, but not the "trial district." · The "trial district" is that territory from all parts of which the jury must be selected, and under the present constitution and laws is confined to the county where the offense is committed, except the accused demands a change of venue. The act above quoted is in violation of the state constitution, and also of the constitution of the United States, because it permits the jurors, both grand and petit, to be selected in another county than Custer. Section 11 of the Nebraska bill of rights is a provision introduced from Article 6 of amendments to the United States constitution. In United States courts the jurors are selected from the whole district, and there is no law or rule by which they must be selected from any particular portion of the district, as for instance, Douglas or Lancaster county. The meaning of the word "district" in the federal constitution is well settled; it is either co-extensive with the limits of the state, or it is a subdivision of the state, similar to a county, with well defined boundaries, and having a

court compelled to select its juries from all parts of
the territory in the district.    It is the dominion a
court—a "trial district." If the word "district" means
"trial district" in the federal constitution, should it
mean something else in the state constitution?    There
is no adjective qualifying the word "district" in either
constitution, but the intention is apparent.    What is
the special purpose mentioned in both these constitu-
tions?    The "right to a speedy public trial by an im-
partial jury."    If it were possible that the word dis-
trict in the state constitution had been used to mean
"judicial district" then there would be a direct conflict
with the United States constitution, and in such case
the provisions of the state constitution are nugatory
and may be annulled and set aside.    *Exparte Garland*,
4 Wall., 358.    (See argument of Reverdy Johnson.)    6
Otto, 432.    7 Otto, 518.

2.    Can a judge imperil the rights of a citizen, his
liberty or life, by *neglecting* to hold courts in the county
in which the offense is committed, so as to enable an
indictment and trial in some other county?    The legis-
lature has said so.    The fact that "no terms of the
district court are held" in the county, is made sufficient.
There may be every facility and every reason for hold-
ing a court, yet if none has been held the judge may
procure the indictment and trial elsewhere.    Here, in
a country where the laws are of English origin, and
where the growth for centuries of the highest civiliza-
tion is supposed to have culminated in the strongest
safeguards to human liberty, we find one man invested
with the power of dragging his fellow citizen before
a foreign tribunal, from whose judgment there is no
escape.    This is more than regal power, it is unlimited
despotism.    If it be law, the right of the citizen to be
secure in his person and his property, in his life and
his liberty, is a dream and a myth, and the bill of

rights may be dropped from our constitutions, state and national, as a silent letter in the orthography of government.

3.   If the *effect* of an act is to accomplish a result forbidden by the constitution, then the act is in violation. of the constitution, and is no law.   The thing accomplished thus far, is the prevention of a trial in the trial district, Custer county.   Hence it follows that an unconstitutional result is brought about by unconstitutional means.   Suppose that the legislature, when it re-districts the state—as it soon will—should leave some county in no district.   What could then be done?   No courts could be held until the county should be put in a district.   It must be so in the case at bar.   In dividing up the territory among the several judicial districts, suppose that it had been provided that this district, where we now are, should be bounded by certain township and range lines, and by accident, from which legislators and constitution framers are no more free than other men, this, Lancaster county, had been cut in two so that part would be in one district and part in another.   It is comparatively an old county. Courts were held in it long before the adoption of the new constitution.   Now, if the fact that part of a county is in one district while part of it is in another prevents the county from being judicially organized, then Lancaster county would not be judicially organized, and would be in just the same condition that Custer county is now in.   But it would be none the less a county, yet no courts could be held until the county should be put into a district.   Would such a mistake take away the right of trial by jury?   Before the adoption of the new constitution containing the mistake every citizen of Lancaster county was entitled to trial by jury.   Would the blunder remove the right or destroy it?   At most, the wheels of justice would

only be clogged until the next legislature removed the bar. If such would be the result in the case supposed, then this case must be disposed of in the same way, and a new trial should be ordered in Custer county. *State v. Denton*, 6 Coldwell (Tenn.), 539. *Osborn v. State*, 24 Ark., 629. *Ex parte Garland*, 4 Wall., 338. *Cummings v. State of Missouri*, 4 Wall., 325. *Commonwealth v. Parker*, 2 Pick., 549. *State v. Robinson*, 14 Minn., 454. *Wheeler v. State*, 24 Wis., 52. When this act was passed it found the alleged offense committed in Custer county, and no lawful act providing for a trial elsewhere. A change of the place of trial renders the act unconstitutional because the district was not "previously ascertained." Art. 6—Amendments to U. S. Const. *State of Minnesota v. Gut*, 13 Minn., 348. *Gut v. State of Minnesota*, 9 Wall., 35.

4. This act is also of the nature of an *ex post facto* law, because it renders the right of trial by jury practically worthless. Whenever the new remedy becomes worthless to either party by reason of its inefficiency, it is unconstitutional because in conflict with Sec. 12 of the Neb. Bill of Rights. *Cummings v. the State of Missouri*, 4 Wallace, 325. *Ex parte Garland*, 4 Wall., 338. 12 Wheat., 608. 8 Wheat., 1. 2 Wheat., 608. 7 Howard, 283.

5. A change of venue may be had only upon the application of the defendants. Sec. 455, Criminal Code.

*C. J. Dilworth*, Attorney General, and *C. W. Mc Namar*, for the State.

LAKE, J.

The first point made, by counsel for the prisoners in their brief, and the first arising in the order of steps taken in the prosecution of the case is, that the affidavit

of C. W. McNamar, by virtue of which the judge of
the fifth judicial district assumed jurisdiction of the
alleged offense, and designated Adams county in that
district as the place of trial, was insufficient for that
purpose.   The question thus raised was renewed by the
motion to quash the indictment, and it· strikes at the
very foundation of the prosecution.

The supposed authority for making this affidavit,
and that for the subsequent action of the judge and
court based thereon, is the act of February 24th, 1879
(Session Laws 62), in the first section of which it is en-
acted, "That it shall be lawful for the judge of any
judicial court within the state of Nebraska, when it
has been made to appear to him that a crime has been
committed, amounting to felony, within any unorgan-
ized county, or territory, or in any county where no
terms of the district court of this state are held, at-
tached to or in his said district for judicial or other pur-
poses, to designate the county in his district wherein
the alleged offense may be inquired into by the grand
jury, and in case an indictment found, the person or
persons so indicted tried."   It is contended on behalf
of the prisoners that this is a void act, and conferred
no power whatever upon either the judge, or court, to
take cognizance of the case.

That portion of·the section which we have quoted—
and it is all of it that need be here noticed—is but a
re-enactment of a prior statute on the same subject,
which, in so far as it pertains to unorganized counties
in a district, was before this court in the case of *Dodge
v. The People*, 4 Neb., 220, and held not to be in con-
flict with any provision of our former constitution.
But, in view of the words, "*or in any county where no
terms of the district court of this state are held,*" we were
then careful, in asserting the constitutionality of the
act, to go no further than was necessary in disposing

of that case. Accordingly, in the opinion of the court, by Maxwell, J., it is said that, "The act above quoted, *so far at least as it applies to unorganized counties*, is clearly within the power of the legislature." This fully met the objection in that case, and in view of the provisions of that constitution, doubtless stated the law correctly.

But, without at all questioning the soundness of that decision, it is now here contended that, by force of our present constitution, this entire statutory provision must fall. The section of the constitution for which this effect is claimed, is the eleventh of the "Bill of Rights," wherein it is declared that, "In all criminal trials the accused shall have the right to, * * * * a speedy public trial, by an impartial jury of the county or district in which the offense is alleged to have been committed." This provision of the fundamental law is peculiar to the constitution of 1875, there being nothing similar to it in that of 1866, and this is the first time we have had occasion to consider it. Its language, however, is too simple, and its meaning too obvious to admit of any serious doubt as to the right thereby intended to be secured to persons charged with crime, under the laws of this state. Of the words employed, "district" is the only one as to the full purpose of which there can be, in the minds of any, even the shadow of a doubt. But this, like the word "county" in the same sentence, is used in a restrictive sense, to limit and control the exercise of both legislative and judicial power in the punishment of criminal offenders.

In its ordinary meaning the word *district* is commonly and properly used to designate any one of the various divisions or subdivisions into which the state is divided for political or other purposes, and may refer either to a congressional, judicial, senatorial, representative, school or road district, depending always upon

the connection in which it is used. In the clause quoted, very clearly it refers to neither of these, and although not synonymous with the word county, yet, by its connection with it, the intention evidently was that they should be taken in a similar sense, and as designating the precise portion of territory or division of the state over which a court, at any particular sitting, may exercise power in criminal matters. And such division, by whatsoever name it may be known in legislation, is co-extensive with, and practically limited by this constitutional provision to that from which a jury, for the particular term, may legally be drawn. And this is in entire accord with our constitutional system of district courts, by which one is designed for each organized county having criminal jurisdiction co-extensive therewith, and assisted by jurors drawn in the manner now provided by law from the whole body of the people thereof.

It is doubtless a legitimate inference from this use of the word " district," without in terms affixing to it any definite territorial limits, that the legislature may, in their discretion, by a general law create trial districts which shall include more territory than a single county. But to be effective under this provision of the constitution such law must be accompanied by one under which jurors can be called from the whole body, and not from a portion merely, of such district. In other words, the trial district and the jury district must be the same.

The grand design of this provision of the fundamental law seems to be to secure to the accused a trial by a jury from the vicinage where the crime is supposed to have been committed, so that he may have the benefit of his own good character and standing with his neighbors, if these he has preserved, and also of such knowledge as the jury may possess of the wit-

nesses who give evidence. before them.   Cooley's Con.
Lim., 395.   Presuming this view of the law to be cor-
rect, and we have no doubt that it is, how stands the
case as to the question of the jurisdiction of the court
ver the alleged offense?   The indictment alleges the
crime to have been committed " within that part of
Custer county lying west of Sherman county, and
within the fifth judicial district,   *   *   *   *   *   and
where no terms of the district court are held or have
ever been held, and that said county of Custer has
never been organized for judicial purposes and has
never been assigned to any county   *   ·*   *   for ju-
dicial purposes."   And it recites the order of the judge
of the fifth judicial district, designating Adams county
as the one " wherein said alleged crime   *   *   *   *
should be inquired into by the grand jury,   *   *   *
and in case an indictment .be found, said prisoner or
prisoners so indicted be tried."

It was doubtless intended to show, by this recital,
that the case was one of those contemplated by the
aforesaid statute, and also the reason why the court,
while sitting in Adams county, was exercising juris-
diction of a crime laid in Custer county.   But even if
it were conceded that this statute is in all respects a
valid act, the alleged 'want of county organization in
Custer is insufficient to bring the case within it.   No
such thing is contemplated by this act as a county un-
organized " for judicial purposes."   Where a county is
once organized for local government under the law
providing how that may be accomplished, as Custer
county confessedly was at and long before that time,
and of which all courts were bound to take notice, it
is organized for all the known purposes of civil admin-
istration—judicial as well as other—just as completely
as is the oldest county in the state.   It is clear that the
act itself makes no such distinction as is here sought to

be established. It does not purport to confer jurisdiction over counties "not organized for judicial purposes," but only in "*any unorganized county.*"

There is, however, a more radical objection to be noticed. At the adoption of the constitution of 1875, the territory now known as Custer county was wholly unorganized, a portion of it being in the fifth and a portion in the sixth judicial district, as formed by that instrument. Sec. 10, Art. VI. In defining these districts, the constitution names several counties, together with "the unorganized territory lying west thereof," as the portion of the state to be embraced by each; and by the second clause of the same section, these districts were to so remain " until otherwise provided by law," that is by act of the legislature.

The boundaries of Custer county were defined by an act of the legislature, approved February 17th, 1877. In July of that year the first election of county and precinct officers was held, the county seat located, and all the machinery of a complete county organization put in motion, as the statute directs. This done, that which the legislature had set apart as Custer county, became detached from the "unorganized territory" of the constitution and united with the organized portion of the state. To it, thenceforward, the term "unorganized territory" was no longer applicable, nor could it be legally treated as such any more than could Douglas or Lancaster county.

The position taken by counsel for the state, that at the time of the alleged murder the portion of territory set apart and organized as Custer county bore, and still bears, the same relation to the fifth and sixth districts as at their creation in 1875—a part being in each —cannot be sustained. The constitution, by an arbitrary line drawn from east to west, divided the "unorganized territory"—by which is to be understood that

portion of the state remaining at any time without a
county organization—between these two judicial dis-
tricts.   Now there is nothing in the constitution pro-
hibiting the formation of new counties, from time to
time, out of this unorganized territory, of such form
and dimensions as to the legislature may seem best.
But the division of a county by the line of a judicial
district is expressly inhibited by the provision in the
eleventh section of said article, that "Such districts
shall be formed of compact territory, *and bounded by
county lines.*"   Therefore, upon the organization of
Custer county, in 1877, its boundaries no longer em-
braced "unorganized territory," but that which had
become organized.   It no longer existed in name
merely, but was a county *de facto*, entitled to all the
rights and privileges under the constitution bestowed
upon these governmental divisions of the state.   Its
territory was no longer divided between the two judi-
cial districts, but, by the acts of organization, was
completely severed from both, and, of necessity, must
so remain until the legislative duty of assigning it to
one of them is performed.   When organized, the county
at once became a political entity, and, under the pro-
vision of the constitution just referred to, could not be
parts of two judicial districts.

   To show perhaps more clearly how this matter
stands, suppose that in the judicial division of the state
by the constitution, one of the counties—Douglas, for
instance—had been overlooked, or that hereafter in a
reorganization of the judicial districts by the legisla-
ture under the power given in the constitution the
same thing should happen, would any one for a mo-
ment contend that by reason of such omission that
county could be regarded as "unorganized territory,"
or that any one of the district judges could lawfully
assume jurisdiction over offenses committed therein

by removing the supposed offenders into his own district for trial by juries drawn from a county remote therefrom? If such contention could not be indulged in the supposed case of Douglas county, how can it be in the real case of Custer? As between the two, wherein lies the difference? In the case of a citizen of Custer charged with crime, is not the constitutional guaranty of a "trial by an impartial jury of the county * * * in which the offense is alleged to have been committed," just as sacred, and equally potent, as it would be in that of a citizen of Douglas? Doubtless it is; and so long as it remains a part of the supreme law of the state there must be suitable legislative provision to enable the courts to conform their practice to it, or the conviction of criminals cannot be sustained.

Such being our views of the political *status* of Custer county, and of the rights of the accused, we have no hesitation in deciding that the district court in Adams county was without jurisdiction, and that the entire proceedings, resulting in the conviction and sentence of the prisoners, are erroneous for that reason.

Having reached this conclusion on the question of jurisdiction, it is really unnecessary to examine the numerous other questions raised on the trial and presented to us by the record; but as they are liable to be renewed in the further prosecution of the accused, we will briefly notice some of the more important of them. And the first in order is the application of the prisoners for a change of the place of trial. Under our statute on this subject, such application is addressed to the sound discretion of the trial court, and unless an abuse of such discretion be clearly shown, this court will not interfere. But here no abuse of discretion appears, and the comparative ease with which competent jurors were obtained, under the circumstances surrounding

the case, shows the soundness of the ruling.    Besides, the motion for removal was bad.    In demanding that the case be sent to a county " *adjoining the county of Custer*," the prisoners sought to dictate to the court the place of trial, which of course could not be tolerated. That would have given to the accused an advantage to which they were not entitled, and of itself was good ground for denying the motion.

A large number of persons called to serve as jurors were challenged on behalf of the prisoners, on the ground of their having formed opinions as to the guilt of the accused.    But we shall refer only to the cases of those to which our attention has been expressly called by counsel.

The first of these is John Forner, who, after an examination on the part of the state tending only to show him competent, was cross-examined by Mr. Laird for the prisoners, and in answer to a question as to whether he had any opinion as to their guilt, answered, "I read the newspaper accounts, and did not know anything to the contrary, and in such a case I take it for what it is worth."    His estimate of what these newspaper accounts were "worth," "in such a case," is shown by a further examination:

Q.    Can you now presume these men, Olive and Fisher, to be innocent?

A.    Well, no, I can't.    Or, yes, I think there is a possibility of their being innocent.

The juror was then challenged, when the judge made this further examination:

Q.    You stated you had formed or expressed no opinion as to the guilt or innocence of the defendants here, Olive and Fisher?

A.    I said so.

Q.    Never read any reports of the evidence?

A.    No, sir.

Q. Never conversed with any of the witnesses in the case?

A. No, sir.

Q. Ever hear any witness testify in court about the matter?

A. No, sir.

Q. Have you any bias or prejudice for or against the accused?

A. I have not.

And thereupon the challenge was overruled, to which an exception was duly taken.

In all criminal trials the presumption of law, in the absence of evidence to the contrary, is that the accused is innocent. Or, as expressed by another, "Innocence, as being the most natural and usual state, is always presumed till rebutted." 1 Phillips on Ev., 4th Am. Ed., 604, note 8. *Garrison v. The People*, 6 Neb., 285. But how can this right, mercifully vouchsafed by the law, be enjoyed, if those accused shall be required to submit their cases to the decision of jurors who are either unable or unwilling to extend it? The answer of this juror, showing as it does that his mind was so impressed by what he had read or heard that he could not presume the prisoners to be innocent, but only the "*possibility*" of their being so, is not at all modified by his further examination, which we have given. In that state of mind he could not stand indifferent between the state and the accused—an indispensable requisite to qualification when insisted upon. We are of opinion, therefore, that the challenge to this juror ought to have been allowed.

The jurors Snyder and Richardson, under the rule observed by this court in several cases brought here for review, were also disqualified. Their respective examinations elicited substantially the same state of facts as to each, and we think show very conclusively that

their minds were biased against the prisoners.    To questions put to them on behalf of the state, both answered that they had opinions as to the guilt of the accused; that their opinions were formed from reading newspaper accounts of the murder; and that notwithstanding such opinions they were unbiased, and could render a fair and impartial verdict upon the evidence. But these opinions of themselves seem to have been hardly warranted in view of their further examination by counsel for the prisoners, from which we quote, first from that of Snyder.

Q.    You said you had an opinion from reading the newspapers?

A.    Yes, sir.

Q.    Ever changed that opinion?

A.    No, sir.

Q.    Would it require testimony to remove it?

A.    *Certainly it would.*

Q.    The opinion which you now have, and which would require testimony to remove, is in regard to the guilt or innocence of the accused?

A.    Yes, sir.

Q.    And for the crime charged here?

A.    All I know about it is what I have read.

Q.    But it is in regard to the indictment for which they are on trial?

A.    If they are guilty they ought to suffer the consequences.

Q.    Have you an opinion as to the crime charged that would require testimony to remove?

A.    I have that opinion yet.

Q.    Is it in regard to the guilt or innocence of the accused?

A.    Yes, sir.

Thereupon several questions were put by the court as to the basis of the juror's opinion, but bringing out nothing new, followed by this one:

Q. Can you sit on this case, notwithstanding your previous opinion, and render just as fair and impartial a verdict as though you had never heard of the case?

A. Yes, sir.

And from the examination of Richardson.

Q. You say you have an opinion?

A. Yes, sir.

Q. With respect to the guilt or innocence of the accused here, and for the crime charged?

A. I have from reports I have read or heard.

Q. Would it take evidence to remove that opinion?

A. It would.

Q. By reason of what you have heard, then, can you say whether you have any bias or prejudice against the defendants?

A. Not in the least.

Q. But you have an opinion as to their guilt or innocence which it would require evidence to remove?

A. I have.

Q. State if, in your opinion, the opinion you have formed will be liable to influence your verdict?

A. Not in the least. I have only made up my mind from reports in different journals I have read.

Q. But it would take testimony to remove it?

A. Yes, sir, it would.

Q. If there should not be enough, you would still have that opinion?

A. Yes, sir, I think I should.

Q. In your present condition of mind you want evidence?

A. Yes, sir.

By the court:

Q. Notwithstanding any opinion you have formed, can you sit on the trial of this cause as a juror, and hear the evidence, and render just as fair and impartial a verdict as though you never formed any opinion?

A. Yes, sir, I can.

Bias is that which sways the mind toward one opinion rather than another. Therefore a jury is biased when from any cause or influence he is inclined toward one party to the action rather than the other; or when, in a criminal case, he is inclined to convict rather than to acquit, or *vice versa*. And in the case of one charged with crime, if a juror's bias be so strong in favor of guilt that he cannot rid himself of it without he have evidence of innocence, his retention on the panel would certainly put the accused to a disadvantage at the outset of the trial, which in a doubtful case might be the real cause of conviction, whether justly or unjustly.

"In all criminal prosecutions" the constitution guarantees to the accused a "trial by an *impartial* jury," that is, a jury unbiased—just; a jury that will give him the benefit of all his rights, including that of the presumption of his entire innocence of crime until proven guilty. *Curry v. The State*, 4 Neb., 545. *Carroll v. The State*, 5 Id., 31. *And it is the duty of the courts to see to it that this guaranty is enforced.* We are of opinion that the challenges to these two jurors ought to have been allowed.

Several exceptions to rulings of the court on the admission of evidence are preserved, of which we will notice the more important. One of the witnesses for the prosecution, McNamar, was asked on cross-examination if he were not acting as one of the attorneys for the state, and answered that he was. This was proper, as tending to show interest on his part. He was then asked whether he were paid by the state, which, on objection on the ground of immateriality, was excluded, and we think properly. This was followed by questions as to whether he were not interested in a case against the prisoner Olive, brought by the

survivors of one of the deceased, to recover $5,000 damages. These questions, on objection by the attorney for the state, were ruled to be "immaterial and improper cross-examination." In this we think the court erred. The evidence thus sought was material, tending as it did to show that the witness was interested in procuring a conviction, and as placing him in his real attitude toward the prisoners, before the jury, by which they could the better judge his testimony. And it was proper to bring this out on the cross-examination. Any interest which a witness may have in the result of the trial in which he is testifying, whether pecuniary or other, may be called out on his cross-examination, as affecting his credibility. Mr. Greenleaf says: "The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests which the law has devised for the discovery of truth. By means of it, the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination and prejudices,   *   *   *   *   *   *   * are all fully investigated and ascertained, and submitted to the consideration of the jury before whom he has testified, and who have thus had an opportunity of observing his demeanor and of determining the just weight and value of his testimony."

Where it is fully understood by the presiding judge that these are among the purposes of a cross-examination, he should be more inclined to enlarge than to narrow the limits to which it may be carried. Prejudicial errors in cross-examination, it will be observed, occur most frequently by restricting too much the field of inquiry.

During his examination in chief this witness also testified, that on the evening before the murder, while following the party who were taking Mitchell and

Ketchum from Plum Creek to Custer county, three horsemen passed him, going in the same direction, and towards the place where the bodies of the murdered men were found the next morning. That he "was quite well satisfied" that the foremost horseman was the prisoner Olive, although "*it was too near dusk to define the features*" at the distance they were from him. On cross-examination he was asked how long he had known Olive, and answered "Since he has resided in Plum Creek." This was followed by two questions— "How long has he resided there?" and "Have you known him well since he lived there?"—both of which, on objection, were held to be immaterial. In this, too, the court erred. Olive certainly had the right to have the testimony of McNamar as to having seen him on the road go to the jury for no more than it was really worth, or to throw whatever discredit upon it he could by showing that his acquaintance with him was so slight, and for so short a time, that under the circumstances the pretended identification must have rested on mere suspicion only.

It is also assigned for error that, generally, throughout the trial the court refused to hear counsel in argument upon the admissibility of testimony. But we are aware of no rule making it error, *per se*, for a judge to refuse advice from counsel on a question of this sort. If he rule correctly, nothwithstanding his refusal to accept the proffered information, no harm is done, and there is no error to correct.

Another and quite novel error assigned is, that the court refused to permit Mr. Laird, one of the attorneys for the prisoners, to cross-examine the witness Bion Brown, called by the prosecution, on the ground that another attorney, Mr. Hamar, had conducted the case for the defense during the direct examination. If the court so decided, it was error. The record, how-

ever, fails to show any ruling upon the question.    All that it shows is this: "Pros. object to Mr. Laird cross-examining the witness, on the ground that Mr. Hamer had conducted the case for the defense during the direct examination, and referred to bar rule XIV.    By Mr. Laird—I have been asked by my co-counsel to examine the witness.    It would have been a pleasure to me to have done so from the first, had I been in the room when it commenced.    I desire to protest on the part of the counsel for the defense against the rule in this case, and I offer to proceed with the examination of the witness in the way pointed out by law, and except to the rulings of the court."    Thereupon Mr. Hamer proceeded to cross-examine the witness.    What this "bar rule XIV" is we are not informed, but whatever its effect, it seems to have been construed by counsel as debarring Mr. Laird from examining the witness, and therefore no express ruling by the court upon the question was insisted upon.

A court may doubtless make reasonable rules for the regulation of the examination of witnesses, and go so far even as to require the attorney who begins either the examination-in-chief or the cross-examination to complete it.    To this, however, there must necessarily be some exceptions, as where, during an examination, the attorney from any cause is disabled to proceed; in such case it may of course be concluded by another.    But no rule can be upheld that arbitrarily dictates which of several attorneys in a case—there being no disagreement between them—shall examine or cross-examine a witness, or that requires the same attorney who took part in the examination-in-chief to conduct the cross-examination.    A rule of this sort could serve no good purpose, and would unwarrantably interfere with the constitutional right of a party to select his own counsel to represent him in the

several branches of the case. One attorney may be employed with special reference to the examination or cross-examination of witnesses, or of a particular witness, another to argue questions of law to the court, and still another to sum up the case to the jury, and to do this is a right which no court can rightfully deny.

On behalf of the prisoner Olive a witness was called who testified that he had the reputation of being a peaceable, law-abiding citizen. On cross-examination this witness was asked, against objection, if he had not heard of Olive having on a certain occasion drawn a revolver on some one, to which he gave an affirmative answer. On re-examination counsel for the accused proposed to show by this witness the circumstances under which, on the occasion referred to, the revolver was used. This the court would not permit, and ruled the proposed testimony from the jury.

In *Commonwealth v. O'Brien*, 119 Mass., 342, it was held to be the rule, when a person accused of a crime introduces evidence of his good reputation, that "it is not competent for the government, in reply, to put in evidence of particular facts," tending to show it to be bad. And in 1 Phillips on Evidence, 4 Am. Ed., 765, it is laid down that "evidence will not be admitted on the part of the prosecution to show the bad character of the accused person, unless he has called witnesses in support of his character; and even then the prosecution cannot examine as to particular facts, the general character of the accused not being put in issue, but coming in collaterally."

The admission of the particular fact of using a revolver, against the prisoner's objection, therefore was error; but it having been done, the error was much aggravated by refusing to permit him to show the circumstances under which he used it. And even if the prisoner had not objected to the fact thus called out

by the prosecution, he would have had the right, unquestionably, to re-examine the witness in reference thereto, and thus place the transaction in its true light before the jury. "If the counsel chooses to cross-examine the witness to facts *which are not admissible in evidence*, the other party has a right to re-examine him as to the evidence so given." 1 Greenleaf on Evidence, Sec. 468.

Although the accused has the right in all criminal cases, no matter how heinous the offense charged may be, to give evidence of his previous good character if he can, yet when it is so strongly marked by deliberation and atrocity, as in the one under considertion, if the jury are convinced that the accused participated in it, good character should be of no avail, even to mitigate the degree of criminality. Whar. Am. Crim. Law, Secs. 643, 644.

In the first instruction to the jury this language is found, and was duly excepted to by the defendants: "You," the jury, "must therefore bear in mind that it is a settled, inviolable principle that, anterior to contrary proof, the accused shall be considered as legally innocent, and that their case shall receive the same dispassionate and impartial consideration as if they were really so. Again, you must bear in mind every consideration of truth, justice, and prudence requires that if the guilt of the accused is not incontrovertibly established, however suspicious judged by you, and construed, not by arbitrary assumption alone, but by the application of the principles of experience in relation to the immutable laws of human nature and conduct."

By the first paragraph of this quotation, if we rightly understand it, the jury were in effect told that until contrary proof had been made to them the accused, though guilty of the crime charged, should be consid-

ered innocent. The language used was at least liable to leave upon the jurors' minds the impression that the judge, who had listened with them to the evidence adduced, really believed them to be guilty. If an instruction do this it is erroneous. But what was intended by the portion remaining we know not. It expresses no idea and is manifestly an unfinished sentence. Whether its effect on the jury were a proper one none can know. It is more than likely, however, that its tendency was to confuse if not to mislead them. Such being the case it was erroneous. *Mutual Hail Insurance Company v. Wilde*, 8 Neb., 427. *People v. Williams*, 17 Cal., 142.

Another instruction seriously complained of is as follows: "Every man is presumed in law to have a good character until the contrary is proved. The indictment in this case having been found and the prisoners put on trial, their characters thereby have a *stain* or *imputation* cast upon the original presumption. To remove this stain or imputation, and restore their characters to its former presumption, they have introduced witnesses to prove their good character among their neighbors and in the community in which they live, for peaceableness, quietness, and as law-abiding citizens, * * * * "

This instruction is faulty; *first*, in its statement that by the facts of indictment found and the placing of the accused on trial a *stain* or *imputation* rested on their characters; and *second*, in limiting the object of this evidence to the restoration of their characters to their former condition. Wharton says: "The general object for which such evidence is introduced is to disprove guilt." And that, even if the accused "offer no evidence of his good character, no legal inference can arise from such omission that he is guilty of the offense charged, *or that his character is bad.*" Whar. Am. Crim.

Law, secs. 636, 637. The exception to this instruction therefore was well taken.

Another instruction complained of is one as to the effect that might be given to the testimony of an accomplice in the alleged crime. The jury were told that while it was unsafe to convict upon such testimony alone, they were at liberty to do so if, on due consideration, they deemed it sufficient. In this there was no error. "The preponderance of authority in this country is, that a jury may convict a prisoner on the testimony of an accomplice alone; though a court may, in its discretion, advise them to acquit, unless such testimony is corroborated on material points." Whar. Am. Crim. Law, sec. 783. "The *degree of credit* which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. It has sometimes been said that they ought not to believe him unless his testimony is corroborated by other evidence; and, without doubt, great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law; it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice, without any confirmation of his statement." 1 Greenleaf on Ev., sec. 380. This instruction contained a proper caution to the jury in receiving such testimony, and we think laid the law down correctly.

Errors are also assigned to the refusal of the court to give to the jury several of the instructions tendered on behalf of the prisoners, but not having been particularly relied on in argument, we shall not take time in this opinion to refer specially to them. On looking them over, however, we find those that would have been proper related generally to matters already sufficiently charged upon, and that they might have been and probably were refused for that reason. One clear,

pointed statement of each legal proposition is sufficient. It is unnecessary to the cause of justice—nay, absolutely hurtful—to smother the jury under a load of repetitions with changed phraseology, as is sometimes done, through fear very likely of rejecting something that ought to be given them.

The only remaining point we shall notice concerns the verdict. The prisoners were found guilty as charged in the sixth count of the indictment, which charged the killing to have been done "by means to the jurors unknown." It is contended that while there was some evidence of the deceased having been killed by shooting, hanging, or burning, there was none to justify the conclusion which the jury reached. The practice has come to be quite common in framing indictments, especially in cases where there can be a possible doubt as to the instrument or means employed to destroy life, to add a count charging it to have been done with some instrument or by some means to the jurors unknown. And in cases like the one before us, this course is not only entirely proper, but the failure to observe it would be censurable negligence in the pleader.

It not unfrequently happens in cases of homicide that the condition of the remains of the deceased is such that it is absolutely impossible to know with reasonable certainty by which of several means life was taken, while there is no doubt whatever as to who was the guilty party. In such case a count of the description of the one now under consideration enables the jury to find a verdict, when if it required them to agree upon the particular instrument or means used by the slayer, they might be unable to do so.

While in our opinion the evidence would support a finding that death was caused either by hanging or shooting, it is not so clear by which mode as to war-

rant us in saying that, in this respect, the verdict was unjustifiable.

Such being our views, it follows that the judgment of the district court must be reversed, the indictment quashed, and the prisoners handed over to the proper authorities of Custer county to be proceeded against according to law.

REVERSED.

MAXWELL, CH. J., dissenting.

To that part of the opinion of the majority of the court holding that the court below had no jurisdiction, I cannot give my assent. It may be conceded that a district for the trial of a person accused of crime cannot be formed after the commission of the alleged offense. And in my opinion that has not been done in this case. The act approved Feb. 25, 1875, provided that "it shall be lawful for the judge of any judicial district within the State of Nebraska, when it is made to appear to him that a crime has been committed, amounting to a felony, within any unorganized county or territory, or in any county where no terms of the district court are held, attached to or in his said district for judicial or other purposes, to designate a county in his district wherein the alleged offense may be inquired into by the grand jury, and in case an indictment is found, the person or persons so indicted tried," etc. Laws 1875, 31.

This act was held valid as to an offense committed in an unorganized county, in *Dodge v. The People*, 4 Neb., 220. That act was superseded by one containing the same powers, passed in 1879, after the murder with which these parties are charged was committed. Laws 1879, 62. This act, therefore, was merely a continuation of the act of 1875—that is, it was merely

continuing in force the provisions of the act of 1875, which we recently held were continued in force by the new act. *State v. McColl,* 9 Neb., 203. *In re Hall,* 10 Neb., 537. The authority of the judge in such case seems therefore to exist without serious question.

Was Custer county unorganized during the years 1878, 1879?

Section one of an act "to define the boundaries of Custer and Wheeler counties," approved Feb. 17, 1877, provides "that all that portion of the State of Nebraska commencing at the south-east corner of township 13 north, of range 17 west of the sixth principal meridian, thence north to the north-east corner of township 20 north, of range 17 west, thence west to the north-west corner of township 20 north, of range 25 west, thence south to the south-west corner of township 13 north, of range 25 west, thence east to the place of beginning, be and the same shall constitute the county of Custer." Laws 1877, 211.

This act of itself would be sufficient to form the county, were it not for the provisions of the constitution prohibiting the formation of a county in two judicial districts.

Section 10 of Art. VI of the constitution provides that "the state shall be divided into six judicial districts, in each of which shall be elected by the electors thereof, one judge, who shall be judge of the district court therein, and whose term of office shall be four years. Until otherwise provided by law said districts shall be as follows: *       *       *       *       *
Fifth District. The counties of Buffalo, Adams, Webster, Franklin, Harlan, Kearney, Phelps, Gosper, Furnas, Hitchcock, Dundy, Chase, Cheyenne, Keith, Lincoln, Dawson, Sherman, Red Willow, Frontier, and the unorganized territory west of said district. Sixth District. The counties of Cuming, Dakota, Dixon,

Cedar, Wayne, Stanton, Madison, Boone, Pierce, Knox, Antelope, Holt, Greeley, Valley, and the unorganized territory west of said district."

"Section 11.  The legislature, whenever two-thirds of the members elected to each house shall concur therein, may, in or after the year one thousand eight hundred and eighty, and not oftener than once in every four years, increase the number of judges of the district courts and the judicial districts of the state.  Such districts shall be formed of compact territory, and *bounded by county lines;* and such increase or any change in the boundaries of a district shall not vacate the office of any judge."

If we construe the words "until otherwise provided by law" by themselves, without reference to other portions of the instrument, the legislature would have undoubted authority to change the boundaries of a judicial district at any time.  But such is not the rule of construction.

Kent says of contracts:  "But if the intention be doubtful, it is to be sought after by a reference to the context, and to the nature of the contract.  It must be a reasonable construction and according to the subject matter and motive.  *  *  The whole instrument is to be viewed and compared in all its parts, so that every part may be made consistent and effectual."  2 Kent Com., 555.  *The People v. Gosper*, 3 Neb., 309.  And the same rule applies in construing statutes.

Kent says:  "It is an established rule in the exposition of statutes that the intention of the law-giver is to be deduced from a view of the whole, and every part of the statute taken and compared together."  1 Kent's Com., 462.  Section eleven therefore provides the time and mode by which the boundaries of judicial districts are to be changed, and the words "until otherwise provided by law" must be construed with reference to

this section.   And this view is strengthened by an ex-
amination of Art. IV, entitled "legislative apportion-
ment," which contains a provision that "until other-
wise provided by law, senatorial and representative
districts shall be formed, and senators and representa-
tives apportioned, as follows:" etc.   The above provi-
sion is substantially the same as in sec. 10, Art. VI, yet
it will not be contended that the legislature can change
the senatorial and representative districts at any session,
as section 2, Article III, points out the time and man-
ner of making the change, and these two sections must
be construed together.   It is very clear to my mind
that sec. 11, Art. VI, is a limitation upon the power of
the legislature, prohibiting it from changing the bound-
aries of judicial districts prior to the year 1880, and
Custer county being composed of territory taken about
equally from the fifth and sixth judicial districts, the
act forming the county is a nullity, and it is still unor-
ganized territory.

But suppose the legislature had authority to organ-
ize the county and attach it to one of the judicial dis-
tricts, it has not done so.   Section 11, Art. VI, provides
that "such districts shall be formed of compact terri-
tory, *and bounded by county lines*" etc.—that is, that an
entire county shall be in one judicial district.   If the
legislature is prohibited from placing a county in two
or more judicial districts, is it not prohibited from
forming one in that manner?   Of this there can be no
doubt.   And if the action of the legislature in placing
a county in two or more judicial districts would be in
excess of its power, and a nullity, it is equally so if it
form a new county in two or more such districts.   The
reason is plain.   No courts could be held in such a
county.   The property of a citizen might be taken, his
rights trampled upon, he be restrained of his liberty
upon an accusation of felony, yet he could have no re-

dress. The provisions of the constitution entitling him to a "*speedy public trial,*" and providing that "all courts shall be open, and every person for an injury done to him in his lands, goods, person, or reputation shall have a remedy by due course of law, and justice administered without denial or delay," cease to be safeguards for the protection of his rights, but are mere declarations without meaning or potency. But it is said the organization of the county is valid, and the provisions for courts must remain in abeyance until such time as the legislature sees fit to attach the county to a judicial district. That is, that it has in part organized the county and it will complete the organization when it sees fit, be it two or ten years. But this, in my view, cannot be done, because it defeats one of the objects for which counties are organized, viz., the administration of justice.

It is very strenuously insisted that under our present constitution, the jury must be drawn "from the county or district where the offense is alleged to have been committed." Sec. 11, Art. I, Const. The section referred to is based on the presumption that the county is settled, organized, and that courts are held therein, and when applied to the organized counties of the state is undoubtedly the law. This section is copied in substance from section six of the amendments to the constitution of the United States. But the existence of such a provision in the constitution of the United States does not prevent the United States courts from punishing crimes committed on the high seas, without the district, and perhaps thousands of miles from the place of trial. The reason is that the national authority must punish such crimes, or they could be committed with impunity. Neither may the accused select the place of trial. So a crime committed in unorganized territory in one of the judicial dis-

tricts of this state, must be punished, if at all, by the forms of law, by permitting the judge to designate the county in which the charges may be examined and the accused tried. As that power has been properly exercised in this case, the action of the judge in that regard should be sustained.