## STATE v. BANISTER.

1. DYING DECLARATIONS are admissible in evidence when the trial judge is satisfied that the death of declarant was imminent, and that he had no hope of recovery, and where the subject of the charge against the prisoner on trial is the death of declarant, and the circumstances of the death was the subject of the declarations; all which requirements were fully met in this case.

2. IBID.—JUDGE AND JURY.—These matters of fact must be determined by the trial judge in the first instance, and if in his judgment the conditions are fulfilled, then the dying declarations are admissible and competent, the credibility, and the circumstances affecting the credibility, of such declarations being a matter for the jury.

3. IBID.—Other declarations made by deceased on a later day, at a time when he had regained hope of recovery and so expressed himself, were properly excluded.

4. EVIDENCE—CORONER'S INQUEST.—On a trial for murder, evidence given by a witness at the inquest over the body of the deceased, may

be proved by the coroner in contradiction of testimony given by this same witness at the trial.

5. A CHARGE TO THE JURY must be read as a whole; and so considered in this case, alleged errors in extracted sentences have no support.

Before WALLACE, J., Anderson, February, 1891.

The Circuit Judge, after defining to the jury in his charge murder, manslaughter, and self defence as general propositions, continued as follows:

Now, let us consider some of the aspects of the case you are trying in connection with the principle that I have submitted to you. In the first place, the defendant says that he did not kill Sam Banister. That is a question of fact for you to settle. If you are satisfied beyond a reasonable doubt that he did kill him, why, you go a step further and inquire whether it was maliciously done—whether it was done with an evil intent. Of course, if you have a reasonable doubt as to whether he killed him or not, you may stop your investigation right there. But if you are satisfied beyond a reasonable doubt that he killed him, then, did he kill him maliciously in the sense I have described to you?

He insists that he did not kill him; if he killed him at all, that he did not kill him maliciously because he did not die immediately, but that his death was hastened by the surgery performed by the Indian doctor.  *  *  *

A great deal has been said in argument as to the rights of John Banister to shoot Sam Banister, upon the assumption that Sam was cutting Jess. Counsel stated the law properly to you, I think, on that point. Now, a man has no right to kill another to prevent the commission of a misdemeanor, but any citizen has the right to shoot another to prevent a felony or to prevent the escape of a felon in any other way. Suppose one man shoots another and kills him, and he is indicted and put upon his trial, his defence is, "I shot him to prevent him from committing a felony"—he must show that the felon was committing a felony, and that you could not have prevented him from committing it without shooting him. You must show that, and if you can show that, you go free; if not, you do not go free. Taking human life to prevent a grievous wound is excusable. If you cannot tell

whether the man is going to kill or not, the law throws the same protection around a man who takes life to prevent a grievous wound, just as it would protect a man for preventing the burning down a house by taking human life, and he must show that the wound would have resulted in a felony; and it is not only excusable homicide, but justifiable homicide, because he is in the discharge of a public duty. As I said, if the case is made out that it is not necessary for him to take the life of a man to prevent the consequences of a grievous wound, then he must take the consequences; if he shows that it was necessary to take human life to prevent a felony, he would be excusable. Now, I don't know that I can say more. The facts are all for you, and my duty is to give you the law, and you apply the facts to the law which I have given you.

If you believe that the defendant here shot Sam Banister, what was the nature of his act? Was it murder? Did he kill him with evil intent, meaning to kill him, intending to kill him, when the killing was not excusable on any of the principles which I have explained to you? If so, you will say guilty. And if you write guilty on the back of the indictment, that would mean murder. If you believe that he killed the deceased in sudden heat and passion, induced by legal provocation, that would be manslaughter. If two men got into a conflict, and one under the passion induced takes the life of the other, that is legal provocation after he has been stricken. If you meet a man while walking on the sidewalk and he jostles you, and you strike him and kill him, that is legal provocation, and you would be guilty of manslaughter. So if you think this defendant is guilty of murder, say "guilty." If you don't think he is guilty, and have a reasonable doubt on that point, you will say "guilty of manslaughter;" but if you have a reasonable doubt as to his being guilty of manslaughter, you will say "not guilty."

Defendant being convicted of manslaughter and sentenced, appealed on the following grounds:

1. Because his honor erred in admitting the testimony of Joshua W. Ashley and Joshua Bigby as to the dying declarations

claimed by them to have been made by the deceased; whereas, under the testimony, he should have excluded them.

2. Because his honor erred in admitting the dying declarations as claimed by the prosecution absolutely, when there was a question of fact as to whether the deceased believed himself to be *in extremis*, which should have been left to the jury in applying those declarations.

3. Because his honor erred, after admitting the declarations of the deceased on the night of the shooting as dying declarations, in excluding the subsequent declarations sought to be introduced into evidence by the defence.

4. Because his honor erred in ruling out the dying declarations of the deceased made on Sunday night before his death on Monday.

5. Because his honor erred in permitting the coroner to read from the evidence taken by him on the inquest, to contradict the witness, Thomas Banister.

6. Because his honor erred in charging the jury: "If you cannot tell whether the man is going to kill or not, the law throws the same protection around a man who takes life to prevent a grievous wound, just as it would protect a man for preventing the burning down a house by taking human life, *and he must show the wound would have resulted in a felony,*" when he should not have charged the words in italics.

7. Because his honor erred in charging the jury, "So if you think this defendant is guilty of murder, say guilty. If you don't think he is guilty, and have a reasonable doubt on that point, you will say guilty of manslaughter; but if you have a reasonable doubt as to his being guilty of manslaughter, you will say not guilty."

*Mr. E. B. Murray*, for appellant.

*Mr. Ansel*, solicitor, contra.

February 16, 1892. The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER. Under an indictment for the murder of Sam Banister, the defendant was convicted of man-

slaughter, and from the judgment rendered on the verdict he appeals on the several grounds set out in the record.

The first four grounds impute error to the Circuit Judge in his rulings as to the admissibility of certain testimony offered as dying declarations of the deceased, the third and fourth grounds being the ones principally relied upon as showing such error. It appears that the deceased was shot on Thursday afternoon, the 24th of December, 1890, and died of the wound on the following Monday morning. On the evening he was shot he made declarations as to who shot him, which in the first and second grounds of appeal are alleged to have been erroneously admitted. These declarations were made to the witness, Joshua W. Ashley, who testified that deceased said to him, "He was shot in the back of the head, and that a bullet was in his brain and he would be obliged to die; that he was going to die, and was obliged to die"— to which the witness responded, "Oh, may be not." And in response to an inquiry from the court, repeating what the witness had said, "Did he say anything more?" replied, "Yes, sir; he said that he could not get well; that he was obliged to die." The witness then was permitted, against the objection of counsel for prisoner, to say, "That Sam Banister told him that his brother John shot him, and that there would have been no trouble but for a little old pistol that his brother John, the defendant, had." Another witness, Josh. Bigby, in response to an inquiry, "What did Sam Banister say about getting well?" replied, "He said that he was shot in the back of the head, and that he had a bullet in his brain, and that he knew he could never get well; that a man with a bullet in his brain could not get well."

At this point counsel for prisoner asked to be allowed to introduce testimony showing that no such conversations as those just detailed had occurred, and that deceased expected to recover, and being permitted to do so, called as his first witness Jesse Banister, a brother of the deceased, who testified that on the third day after he was shot deceased told him "that he was better, and that he thought he would get well." The attending physician was then called, who testified that, after making an examination of the wound, "I said, Mr. Banister, the ball has entered your brain, but I cannot locate it, and it is a question of time with

you as to the period of time the inflammation may set in. He seemed perfectly quiet." Did you indicate to him that the wound was not necessarily fatal ? "I told him that we had instances on record where persons had been wounded in the head and recovered, but not where a foreign body was imbedded in the brain where they would recover." In response to an inquiry from the counsel for the prisoner, whether deceased thought he was going to die, the doctor replied, "I cannot tell you. He did not express himself to me. I was a stranger to him and his family." And being asked by the court whether he meant deceased to understand that his death would probably result from that wound, he replied, "Yes, sir." It is stated in the "Case" that the witness Ashley was there after the doctor. Other witnesses, members of the Banister family, were examined, who testified that they did not hear Sam Banister express any apprehension of dying, and that though they were in the room when Ashley and Bigby were there, they heard nothing of what was testified to by those witnesses. On the contrary, one of them, the wife of the deceased, said that deceased told her that Jim Henry Nelson shot him, but she did not say when he told her so.

After hearing this testimony, the court ruled that the dying declarations of the deceased, offered by the State, were admissible ; and this ruling constitutes the basis of the first two grounds of appeal. We think it clear that these two grounds cannot be sustained. The requirements of the rule laid down in *State* v. *Johnson* (26 S. C., 152), were fully met. To render these declarations admissible, it was only necessary that the trial judge should be satisfied, 1st. That the death of deceased was imminent at the time the declarations were made. 2nd. That the deceased was so fully aware of this as to be without hope of recovery. 3rd. That the subject of the charge was the death of the declarant and the circumstances of the death was the subject of the declarations. As to the first point, the fact that death did ensue a short time afterwards, as expected by the attending physician, was quite sufficient to satisfy the judge that the first requirement of the rule was met. As to the second, the expression of the deceased that he "was obliged to die," made after the examination of the physician, which informed him of

the fact that the bullet was lodged in his brain, was abundantly sufficient to show that deceased had lost all hope of recovery; and as to the third requirement of the rule, there is no question that it was fully met, as the express terms of the declaration fully show.   It is clear, therefore, that there was no error in admitting the dying declarations of the deceased as testified to by the witnesses Ashley and Bigby, and hence there is no foundation for the first ground of appeal.

The second ground of appeal is clearly unsustainable.   The Circuit Judge must necessarily determine, in the first instance, the questions of fact, whether the deceased was *in extremis*, and whether he had lost all hope of recovery at the time the declarations were made; for it would not do to stop the case and refer such preliminary questions of fact to the jury for trial, and we know of no precedent or authority for such an anomalous mode of proceeding, even in those States where the courts have been disposed to go much further in excluding dying declarations than the courts of this State have ever shown any disposition to go.   As in cases where the confessions of the accused are offered in evidence, the judge must necessarily determine the question of fact whether they were free and voluntary in order to ascertain whether such confessions are *competent* evidence; but after they are received as competent evidence, the jury may, and in fact must, pass upon their credibility, and in doing so may consider whether in fact they were free and voluntary, or extorted by fear or incited by hope.   So, in reference to dying declarations, the judge must first determine whether the dying declarations offered were made under such circumstances as would render them *competent* evidence under the rules of law; but after they are properly admitted as competent, it is for the jury to pass upon their credibility, and in considering such question, they may consider the question of fact whether the deceased was *in extremis*, and whether he had lost all hope of recovery.

It is not very clear from the frame of the second ground of appeal whether the intention was to raise the question, whether it was not the duty of the judge to have the questions of fact preliminary to the admissibility of the dying declarations determined by the jury before their competency could be deter-

mined, or whether the intention was to impute error to the judge in not instructing the jury that notwithstanding he had determined these preliminary questions of fact, it was still for them to consider whether in fact the conditions existed which would render them admissible as *competent* evidence, as bearing upon the question of their credibility. If the former was intended, then the matter has been disposed of by what has already been said; if the latter, then it is sufficient to say that it does not appear that the judge was requested so to instruct the jury. In addition to this, it does appear that the jury were explicitly instructed that *every* question of fact was for them to consider.

The third and fourth grounds of appeal allege error in excluding certain declarations alleged to have been made by the deceased on the Sunday night after he was shot, inconsistent with those made on the evening he was shot, which had been received in evidence. The following statement appears in the "Case" as to what occurred, after the judge had ruled the declarations made on the evening of the shooting to be admissible: "A number of witnesses were next examined for the State and the defence, in which it was shown that John Banister and Jesse Banister were at the residence of Thomas Banister, in the county and State aforesaid, on the afternoon of December 24, 1890, when Sam Banister and James Henry Nelson drove up in a buggy and got out in the yard. A wrestle between John Banister and Nelson ensued, about which the parties grew angry. The testimony of the witnesses for the State either showed or tended to show that Sam Banister was shot in the back of the head by John Banister; while the testimony for the defence showed or tended to show that he was shot by James Henry Nelson," after which the defence offered Martha Mitchell, the aunt of John and Sam Banister, who went to the house of Thomas Banister on the night of the day after Sam was shot, and stayed there until he died, and proposed to prove by her certain declarations alleged to have been made by the deceased on the Sunday night before he died, which upon objection were ruled out, because it appeared from the testimony of this lady that the deceased then thought he was getting better, and it had previously appeared from the testimony of Jesse Banister that on the

third day after he was shot, deceased said he was better and
thought he would get well. This witness, however, was allowed
to testify that the deceased said on Christmas day—the day after
he was shot—"that Jim Henry Nelson shot him." There was
no error in this ruling, for it appeared from the testimony of the
same witness who was offered to prove the declarations alleged
to have been made on Sunday night, as well as from the testi-
mony of Jesse Banister, that the deceased was not then in the
condition of mind required by the rule, as he then thought he
was getting better. As to the effect of a subsequent hope of
recovery, see the cases cited in a note on page 117 of 6 Am. &
Eng. Encycl. of Law.

The fifth ground of appeal, which imputes error to the Circuit
Judge in permitting the coroner to read from the evidence
taken by him at the inquest to contradict the witness,
Thomas Banister, is disposed of by what is said in the
case of *State* v. *Jones*, 29 S. C., 201.

The sixth and seventh grounds of appeal, alleging error in cer-
tain expressions used by the Circuit Judge in his charge
to the jury, cannot be sustained. As has often been held,
the charge must be read as a whole, and not in detached
parts, and so reading this charge, which, with the grounds of
appeal, should be incorporated in the report of this case, we do
not think there is any foundation for the alleged errors.

The judgment of this court is, that the judgment of the Cir-
cuit Court be affirmed.