Argued January 10, decided March 3, 1908.

## STATE v. DORIS.

[94 Pac. 44.]

[16 L. R. A. (N. S.) 660.]

HOMICIDE—APPEAL—QUESTIONS IN LOWER COURT—DYING DECLARATION.

1. Where a dying declaration was admitted in the lower court without objection, except as to certain specific parts thereof, the inquiry as to whether the declaration was admissible in the first instance, will not be reviewed.

SAME—DYING DECLARATIONS—CREDIBILITY—QUESTION FOR JURY.

2. Where it appears from the evidence that the question as to whether declarant was in such a condition and state of mind as to entitle his statements to the same degree of credit as is usually given to one who is *in extremis*, and has no hope of recovery, and as to whether he was not given sufficient encouragement to justify him in entertaining hopes of recuperation, is one concerning which reasonable minds might reach different conclusions, the final determination thereof should be left to the jury, the same as any other fact bearing on the innocence or guilt of the accused.

SAME—PRELIMINARY EVIDENCE—DISCRETION OF THE COURT.

3. The preliminary inquiry into whether the surrounding circumstances constitute sufficient predicate for the admission of a statement as a dying declaration, is solely within the province of the court, reviewable only for an abuse of discretion.

SAME.

4. Where the state offered testimony tending to show that an alleged dying declaration was made under a sense of impending death, and the declaration was thereupon admitted in evidence, the court should have admitted testimony as to all circumstances bearing upon, and immediately connected with its execution, including all statements made at the time to and by decedent as to his condition, as well as anything tending to throw light upon the motive which prompted him to make the statement.

CRIMINAL LAW—INSTRUCTIONS—ASSUMPTION AS TO FACTS.

5. Where it appeared from the evidence that the question as to whether declarant, at the time of making an alleged dying declaration admitted in evidence, may have had hopes of recovery, and as to whether statements were made to him giving him ground for such hope, was one concerning which reasonable minds might reach different conclusions, an instruction as-

suming as an indisputable fact that the declarant was *in extremis*, and under full sense of impending death, and that his declaration was made while he was in such frame of mind as to entitle his statement to full consideration as a dying declaration, and that the same weight should be given his statement as might be given to any other evidence in the case, was erroneous.

HOMICIDE—DYING DECLARATIONS—SUBJECT-MATTER.

6. Under Section 718, subd. 4, B. & C. Comp., providing that evidence may be given on the trial of the declaration or act of a dying person, made under the sense of impending death, respecting the cause of his death, a statement by deceased that he had never had any trouble with defendant before, and that declarant had no gun and did not own one, was not admissible, since the statements must be limited to the *res gestæ.*

SAME—FORM—ORAL STATEMENT.

7. After a dying declaration had been made and signed by declarant, a statement was added by a third person, to the effect that deceased requested to add that just before defendant called him a liar, he turned away and said: "Oh, it doesn't amount to anything anyway, and there is no harm done." *Held* that, while such statement was part of the *res gestæ*, and admissible as such, it should not have been admitted as a part of declarant's written statement, but should have been proved in the same manner and under the same conditions as would any oral declaration.

SAME.

8. Where statements are made under a sense of impending death, and on the same occasion, they are admissible as dying declarations, although partly oral and partly written.

SAME—TRIAL.

9. Where a dying declaration is partly oral and partly written, in order that undue prominence may not be given to the contents of the written statement over the oral, the written declaration should not be taken to the jury box, and only such portions thereof as may be deemed material and competent, should be read to the jury, thereby placing the written statement on equality with the oral statement of declaration.

SAME—INSTRUCTIONS.

10. An instruction that the declaration of deceased should be considered, and is entitled to the same weight as any other evidence offered, was too broad. The jury should have been told that, if they determined that the declaration was *in extremis*, and was made under full belief of impending death, they might give the statements the same weight as they would if the declarant were living and made the statement attributed to him, or had given testimony of similar import under oath, without cross-examination thereon; proper consideration being given to all circumstances surrounding the declaration when the statement was made, together with his physical and mental condition, including any apparent influence, if any, under which he might have been laboring at the time.

INSTRUCTIONS—DYING DECLARATIONS.

11. Dying declarations being in their nature secondary evidence, an instruction to the effect that the declaration of a decedent, made under a sense of impending death, is entitled to the same weight by the jury as any other evidence in the case, is too broad, and if given without qualification is reversible error.

SAME—EVIDENCE—SELF-DEFENSE.

12. Where the testimony showed that deceased was a man capable of inflicting great bodily harm on defendant, the latter could show that a short

time before he had been assaulted by a person of like physique and strength, and had been severely injured and maimed by him; such evidence being competent for the purpose of determining who was the aggressor, as well as to show the degree of defendant's apprehension at the time of the affray, and as bearing upon the motive prompting him to carry arms, and under which he was acting in drawing the revolver with which he shot deceased.

HOMICIDE—EVIDENCE.

13. An ideal man cannot be taken as a model by which every person charged with homicide must be judged; hence the jury are entitled to consider testimony tending to show that defendant, a short time before the affray, had, without provocation, been assaulted by others, as tending to explain how he happened to be armed on the occasion of the tragedy, as well as to indicate the mental state under which he was acting at the time, thus placing the jury as nearly as practicable in the position of the accused, and enabling them to determine how a reasonable man might have acted on the occasion.

WITNESSES—CROSS-EXAMINATION—CHARACTER OF DEFENDANT.

14. Where defendant offered testimony relative to his general reputation questions on cross-examination as to rumors of particular instances of trouble with others were permissible. The scope of such examination is within the discretion of the trial court, and subject to review only for an abuse thereof.

SAME—REDIRECT EXAMINATION—EXPLANATION OF FACTS ELICITED ON CROSS-EXAMINATION.

15. Where defendant offered testimony as to his general reputation, and on cross-examination it was shown that he had had trouble with different persons, he was entitled to have the facts presented showing the general nature of such trouble, and that he was not the aggressor.

SAME—RECROSS-EXAMINATION.

16. Where after defendant had offered testimony as to his general reputation, the State on cross-examination elicited facts tending to show that defendant had had trouble with certain persons, and the court then refused to permit defendant to show that in such troubles he was not the aggressor, it was error to permit the State on recross-examination to show that such troubles were brought about by defendant.

HOMICIDE—SELF-DEFENSE—EVIDENCE—THREATS BY DECEASED.

17. In a prosecution for homicide, evidence of threats made by deceased three weeks prior to the shooting were admissible as tending to show who was the aggressor, although such threats had not been communicated to defendant.

SAME.

18. Merely offensive words, springing naturally from accused while engaging in the quarrel, were not sufficient to deprive him of the right of self-defense, when not accompanied by circumstances clearly showing an intent on his part to provoke some kind of an affray.

SAME—INSTRUCTIONS.

19. Where the evidence disclosed that defendant at the time of the homicide was armed with a revolver, which he was carrying in his pocket, this having been his custom for some time past, the court should have given a requested instruction that, if the jury found that defendant had for a long time carried a pistol and had it on his person at the time of the homicide, in pursuance of his usual custom, and without any reference to deceased, the fact that he had a pistol, whether rightfully or wrongfully, ought not to prejudice them in the trial of the case, and that fact should not be considered

except as it might bear upon his conduct in the affray, and that the mere fact that a man is armed at the time of the affray, does not necessarily take away or lessen his right to self-defense.

HOMICIDE—EVIDENCE—MISDEMEANOR.

20. It is not the being armed, but the manner thereof, that constitutes a misdemeanor under the statute.

CRIMINAL LAW—INSTRUCTIONS—THEORY OF CASE.

21. Defendant was entitled to such instructions as would thoroughly present his theory of the case to the jury under the evidence.

From Wallowa: THOMAS H. CRAWFORD, Judge.

The defendant, James Doris, was convicted of the crime of manslaughter for killing Charles G. Sim, and sentenced to be imprisoned in the penitentiary for the period of ten years, from which he appeals.

REVERSED.

For appellant there was an oral argument by *Mr. Alfred S. Bennett,* with a brief over the names of *Burleigh & Boyd* and *Bennett & Sinnott,* to this effect:

Dying declarations are admissible only as to what occurred at the very time of the homicide, and which is a part of the *res gestae* of the occurrence: *State* v. *Vansant,* 80 Mo. 76; *State* v. *Eddon,* 8 Wash. 299 (36 Pac. 139) ; *Craven* v. *State,* 49 Tex. Crim. Rep. 78 (90 S. W. 311) ; *State* v. *Spivey,* 191 Mo. 87 (90 S. W. 81) ; Gillett, Collateral Ev. § 198.

The weight and credibility of dying declarations, and the corollary questions as to whether they are dying declarations, is ultimately for the jury, who are entitled to know all the conditions and circumstances under which they are made: Oregon Const. Art. 1, § 16; B. & C. Comp. § 1378; *People* v. *Thomson,* 145 Cal. 717 (79 Pac. 435) ; *State* v. *Phillips,* 118 Iowa, 660 (92 N. W. 876) ; *Commonwealth* v. *Brewer,* 164 Mass. 577 (42 N. E. 92) ; *State* v. *Reed,* 53 Kan. 767 (42 Am. St. Rep. 322: 37 Pac. 174) ; *Nordgren* v. *People,* 211 Ill. 425 (71 N. E. 1046) ; *Findley* v. *State,* 125 Ga. 579 (54 S. E. 106) ; *State* v. *Eddon,* 8 Wash. 297 (36 Pac. 139) ; *State* v. *Mayo,* 42

Wash. 540 (85 Pac. 255); *Hopkins* v. *State* (Tex. Crim. App.), 53 S. W. 621; *Green* v. *State*, 154 Ind. 655 (57 N. E. 638); *State* v. *Gay*, 18 Mont. 51 (44 Pac. 414); *Starkey* v. *People*, 17 Ill. 23; *North* v. *People*, 139 Ill. 102 (28 N. E. 966); *State* v. *Banister*, 35 S. C. 290 (14 S. E. 678); *Walker* v. *State*, 37 Tex. 366; *State* v. *Swift*, 57 Conn. 496 (18 Atl. 664); 1 Greenl. Ev. (14 ed.) § 160; Gillett, Collateral Ev. p. 254, § 203.

The mere hasty use of harsh or angry words by the defendant, leading to an assault, will not shut off the right of self-defense, where there was no menacing act, and no intention to provoke an affray: *Bearden* v. *State*, 46 Tex. Crim. Rep. 144 (79 S. W. 39); *State* v. *Gordon*, 191 Mo. 114 (109 Am. St. Rep. 790: 89 S. W. 1029); *State* v. *Perigo*, 70 Iowa, 657 (28 N. W. 456); *People* v. *Thomson*, 145 Cal. 717 (79 Pac. 436); *State* v. *Taylor*, 57 W. Va. 228 (50 S. E. 251); *McCandless* v. *State*, 42 Tex. Crim. Rep. 58 (57 S. W. 673); *Boatwright* v. *State*, 89 Ga. 140 (15 S. E. 21); *Fussell* v. *State*, 94 Ga. 78 (19 S. E. 891); *Sams* v. *State*, 124 Ga. 25 (52 S. E. 18); *Goodwin* v. *State*, 73 Miss. 873 (19 So. 712); *Massie* v. *Commonwealth*, 16 Ky. L. Rep. 790 (29 S. W. 871); *People* v. *Curtis*, 52 Mich. 616 (18 N. W. 388).

For the State there was an oral argument by *Mr. Isaac H. Van Winkle*, Assistant Attorney General, with a brief over the names of *Mr. Francis S. Ivanhoe*, District Attorney, and *Mr. Andrew M. Crawford*, Attorney General, to this effect:

The question of the competency of a dying declaration is one for the court; and the question whether the declaration was made under a sense of impending death, without hope of recovery, is never a question for the jury: *John's Case*, 1 East, P. C. 358; *Donnelly* v. *State*, 26 N. J. L. 463; *Starkey* v. *People*, 17 Ill. 23; 1 Roscoe, Crim. Ev. 37; 1 Bishop, New Crim. Proc. § 1212; 1 Elliott, Ev. § 355; *Gipe* v. *State*, 165 Ind. 433 (1 L. R. A. [N. S.] 419: 112 Am. St. Rep. 238: 75 N. E. 881).

The conclusion of the trial court that dying declarations are admissible, is one which will not be disturbed on appeal, unless it is manifest from the record that no evidence in the case warrants such conclusion: *Swisher* v. *Commonwealth*, 26 Gratt. 963 (21 Am. Rep. 330); *Gipe* v. *State*, 165 Ind. 433 (1 L. R. A. [N. S.] 419: 112 Am. St. Rep. 238: 75 N. E. 881).

The character of the wound may of itself warrant the inference sufficient to admit the statement that the deceased, at the time of making it, was under the sense of impending death, without hope of ˙recovery: *King* v. *Woodcock*, Leach, C. L. 503; *Anthony* v. *State*, 33 Am. Dec. 143; *McLean* v. *State*, 16 Ala. 672; *Hill* v. *Commonwealth*, 2 Gratt. 594; 3 Russell. Crimes (9 Am. ed. from 4 London ed.), 250; *Green* v. *State*, 154 Ind. 655 (57 N. E. 637); *Gipe* v. *State*, 165 Ind. 433 (1 L. R. A. [N. S.] 419: 112 Am. St. Rep. 238: 75 N. E. 881).

No mere threat of violence can justify or excuse the taking of human life, and where one seeks another, provokes an assault, and instantly kills his assailant, evidence of previous uncommunicated threats is inadmissible for any purpose: *Karr* v. *State*, 100 Ala. 4 (46 Am. St. Rep. 17: 14 So. 851); *People* v. *Campbell*, 59 Cal. 243 (43 Am. Rep. 257); *State* v. *Harris*, 45 La. Ann. 842 (40 Am. St. Rep. 259: 13 So. 199); *State* v. *Bartmess*, 33 Or. 110 (54 Pac. 167); *State* v. *Tarter*, 26 Or. 38 (37 Pac. 53); *State* v. *Hawkins*, 18 Or. 476 (26 Pac. 475).

Opinion by MR. COMMISSIONER KING.

James Doris was convicted of the crime of manslaughter for the killing of Chas. G. Sim in Wallowa County on October 1, 1906, and sentenced to ten years' imprisonment, from which he appeals.

The killing is admitted, but defendant claims that, while acting in self-defense, the weapon used was accidentally discharged, shooting Sim, from the effects of which he died on the following day; that Sim was a large and strong man, weighing 185 pounds, but defendant

was small in stature, weighing but 125 pounds; that deceased made a vicious assault upon him, and considering his life in danger, and being physically unable to defend himself, he drew the pistol as the only means of self-preservation, but that when he did so, he expected to stop the attack upon him without the necessity of shooting his assailant. The trouble appears to have had its inception in a remark which decedent quoted defendant with having made, to the effect that certain young ladies in the vicinity could not play for a dance which was soon to take place, and in the arranging of which defendant was one of the committee. It appears that defendant, on hearing of the statement, called upon Sim for an explanation; that he first denied having made the remarks attributed to him, but, on being reminded of his statements by one of the young ladies present, admitted having used the imputed words, whereupon defendant called him a "d——d liar," when deceased, who was but a few feet away, made the alleged assault, with the result indicated.

1. At the trial witnesses were called by the state who testified that Sim, on the day of his death, was told by his physician and friends present that he could not recover, whereupon he was requested to make such statement as he desired concerning the tragedy. On cross-examination facts were elicited tending to show that although decedent was very weak and it appearing that death was near, of which he was informed by the physician in attendance, he entertained hopes of recovery, concerning which the physician, the state's witness, testified on cross-examination as follows:

"Q. State whether or not you had informed him of his condition before he made this statement?
A. I did. He says, 'Doctor, what do you think about my case?' I says: 'Sim, I will have to be honest with you. You can look for the worst; expect the worst'—I says. And his remarks he made, if you asked for them —he says, 'Why,' he says, 'Why should I die? I feel

stronger now than I did last night, and I'll tell you,' he says, 'I have been in worse shape than this,' or words to that effect. He said he had typhoid fever at one time, and he says: 'It will be probably necessary to have some brandy handy, and if it is necessary, give me brandy.' And I gave him hopes then, and I felt like being as hope-ful with him as I possibly could."

After adducing further testimony on the point, the declaration, without objection, was admitted in evidence, as follows:

"Lostine, Oregon, Oct. 22, 1906.
Statement of Chas. G. Sim:

I was sitting in parlor of Hotel Haun, and Jimmie Doris said: 'Come out, Charley, I want to talk to you.' I stepped out, and Flossie Haun and Jimmie Doris and O. W. Pagan was present. He said: 'Did you tell Flossie Haun that he (Doris) said that they could not play for the dance?' I said, 'No,' at first. Then Flossie asked him if he didn't tell me that Jimmie Doris said so, and I said, 'Yes.' Then Doris called me a damned liar. Then I caught him with my left on his jaw. I was standing close enough to do so. Just as I struck him he fired. He must have had his gun ready to fire. I have no gun, and do not own one. I never had any trouble with him be-fore. He made a nasty remark in his paper some time ago about two members of the McCurdy family been doing the town. I then asked, 'Who edited the locals?' and he said: 'That is my business.' I didn't say a word.
                                    Charles G. Sim.

After reading the paper, Mr. Sim requested to add that just before he called him a d——d liar he turned away and said: 'Oh, it doesn't amount to anything, anyway, and there was no harm done.'
Witnesses:

W. R. Hislop,                                    S. P. Crow.
Dr. E. R. Seely,
S. L. Magill."

After the state rested, a witness to the making of the declaration was called, who testified that all the state-ments made by the declarant at the time were not in-cluded in the written statement. After saying that the

declaration was obtained by questions and answers, the substance of which was written down and afterwards corrected by the deceased, the witness stated that the declarant was asked concerning his "intention at the time that he struck the defendant, if he intended to follow it up by giving him a thrashing," and that decedent answered, "Yes," that he intended to punish defendant and "would have done so if he had not got him, or shot him." The witness was then interrogated as to what, if anything, was said to Sim just before he made this statement in relation to the purpose thereof, and the probability of his recovery, and as to the purpose for which the dying declaration was made, objections to which were made and sustained. The following offer was then made by the defense, but denied by the court: "Defendant offers to prove by the answer to the last question propounded that just before making the statement introduced in evidence, parties in the room, and among others Mrs. Haun, said to Sim: 'We are not afraid but that you are going to get well, all right, but we want your evidence so as to punish him just as hard as we can,' and then Sim immediately after made the statement introduced in evidence, and for the purpose of proving this we ask to renew the question just asked, and to have the court permit the same to be answered." After the case was closed, counsel for defendant, as bearing on the point, requested the court to instruct the jury that: "The dying declaration of the deceased has been offered in evidence, but this ought not to be considered by you, unless it was made under a sense of impending death, and if you believe from the evidence that the deceased did not expect to die, but expected to get well at the time this statement was made, you should give it no consideration whatever." This was refused, and the court, over objections thereto, *inter alia,* said to the jury:

"In this case the dying declarations of the deceased have been introduced in evidence and read to you. The

law presumes that the deceased, when fatally wounded, with knowledge of that fact of his condition and that he must presently die, is so impressed with the solemnity of the occasion and his surroundings that he has every inducement to speak the truth as fully as though he were under oath, and I instruct you that the dying declarations of the deceased introduced in evidence in this case are entitled to be considered by you as other evidence in the case given by witnesses under oath before you, and you are entitled to give the same such consideration and weight as you think, under all the circumstances, the same is entitled to."

The point raised by the testimony offered and instruction requested, as well as objection to the instruction given, is that after the declaration was admitted the jury should have been permitted to determine whether the statements were made under such circumstances as would entitle them to consideration as the dying declaration of decedent, and accordingly what, if any, weight should be given thereto, and that in order to determine the weight and credibility thereof the testimony as to all the facts connected therewith should have been admitted; while the State insists that the question is one for the determination of the court alone, and that, when the statement was once admitted in evidence, the jury were precluded from questioning it, or considering the incidents surrounding the declaration, but bound to treat and consider it in the same manner, and give the same credit thereto, to which the testimony of any witness sworn and testifying in the cause might, in their judgment, be entitled to receive. And from the rulings made and instructions given this appears to have been the position of the court below.

In this connection it will be noted that the evidence offered is far from being conclusive as to whether at the time the declarant made his statement he believed death was near. He, at least, manifested some doubt on the subject, and the doctor present testified that he gave him some hope. The statement, however, was admitted with-

out objection, except as to certain specified parts thereof, from which it follows that the inquiry as to whether the declaration was admissible in the first instance is not before us, and the questions arising on that point being argued and presented by the parties hereto on the assumption that the preliminary inquiry disclosed sufficient facts to make the declaration *prima facie* admissible, it will be so treated here.

2. But, conceding its admissibility in the first instance, it appears from the evidence before the jury, as well as from the proffered testimony, that the question as to whether declarant was in such a condition and state of mind as to entitle his statements to the same degree of credit as is usually given to one who is *in extremis,* and has no hope whatever of recovery, and as to whether he was not given sufficient encouragement to justify him in entertaining strong [hopes of recuperation, is one concerning which reasonable minds might draw different inferences and reach different conclusions. From this it follows that the final determination thereof should have been left to the jury, as would that of any other fact bearing upon the innocence or guilt of the accused. As stated by Mr. Chief Justice LORD in *State* v. *Shaffer,* 23 Or. 555, 560 (32 Pac. 545, 547) :

"The rule of law undoubtedly is that the credibility of dying declarations is to be determined by the jury in view of all the circumstances under which they were made."

3. The authorities on this point are confusing and are far from being harmonious. This, however, is largely the result of the application of the rule to the facts in the different cases, without reference to exceptions thereto. It is proper and necessary in all cases that the court should make a preliminary inquiry as to whether any statement offered as a dying declaration was made under a sense of impending death, and that, before the admission thereof, evidence should be heard upon this

question. This preliminary inquiry into whether the surrounding circumstances constitute sufficient predicate for the admission of the declaration is solely within the province of the court, and reviewable only for an abuse of discretion: 4 Ency. Ev. 947; *State* v. *Shaffer,* 23 Or. 555 (32 Pac. 545) ; *People* v. *Brecht,* 120 App. Div. 769 (105 N. Y. Supp. 436). On this point the authorities appear harmonious. Where but one deduction can reasonably be drawn from the testimony, and it is to the effect that the declaration was made *in extremis,* under a sense of impending death, the court must admit the declaration; and its admission is conclusive upon the jury, which, under such circumstances, should be so instructed. But, if the predicate for the dying declaration appears doubtful, and of such character that men of average reason and prudence might draw different conclusions therefrom, the inquiry then becomes one of fact, and must finally be submitted to the jury.

In this respect the question under consideration is analogous to that where a confession of a defendant is offered in evidence, in which the court is called upon to preliminarily determine whether it was freely and voluntarily made; but where, under the evidence, the question as to whether made, and circumstances surrounding it, is involved in doubt, it is for the jury ultimately to pass upon its character and determine whether it was made in the manner claimed for it, in order to ascertain the weight to be given thereto: *State* v. *Rogoway,* 45 Or. 601 (78 Pac. 987, 81 Pac. 234) ; *State* v. *Banister,* 35 S. C. 290 (14 S. E. 678) ; *People* v. *Oliveria,* 127 Cal. 376 (59 Pac. 772). In *State* v. *Rogoway,* 45 Or. 607 (78 Pac. 989), Mr. Justice BEAN says:

"The evidence for the State tended to show that the alleged confession of the defendant was voluntarily made; and, while this evidence is controverted and contradicted, there is not sufficient in the record to justify this court in saying that the trial court erred in holding that the confession was competent and admissible as

testimony. The admissibility of the testimony was for the court, and its credibility and weight were for the jury, and were properly submitted to them."

In stating that "the admissibility was for the court," the opinion has reference to its admission in the first instance and not to the procedure after once received in evidence. In *Wilson* v. *United States,* 162 U. S. 613, 624 (16 Sup. Ct. 895, 900: 40 L. Ed. 1090), on this point, Mr. Chief Justice FULLER says:

"When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject the confession, if, upon the whole evidence, they are satisfied it was not the voluntary act of the defendant."

This is clearly the rule in respect to the admission of confessions, and we can perceive of no reason why the same principle should not be applicable to dying declarations. The rule thus announced is recognized and upheld by the great weight of authority on the subject, among which are *Roesel* v. *State,* 62 N. J. Law, 216 (41 Atl. 408); *People* v. *Howes,* 81 Mich. 396 (45 N. W. 961); *Hardy* v. *United States,* 3 App. D. C. 35; *State* v. *Vincent,* 16 S. D. 62 (91 N. W. 347); *People* v. *White,* 176 N. Y. 331 (68 N. E. 630); *Hamlin* v. *State,* 39 Tex. Cr. R. 579 (47 S. W. 656). To further illustrate, a written instrument might be offered in evidence, preliminary to which the court would first demand proof as to the signature, etc., and if, after being satisfactorily shown, it is admitted, only a clear abuse of discretion would be reviewable on appeal. But when once admitted any testimony showing forgery thereof, or, if genuine, any doubtful and unfavorable circumstances under which it may have been signed, such as duress, intoxication or insanity, when properly in issue, would be entitled to go to the jury to enable them to determine the weight to be given thereto, even to rejecting it entirely, if they chose

to do so. And, as stated by Mr. Justice WEAVER, in *State v. Phillips,* 118 Iowa, 660, 674 (92 N. W. 876, 881) :

"A familiar illustration of the principle we believe applicable here may be found in the case of a party charged with a crime alleged to have been committed in pursuance of a conspiracy. Upon a *prima facie* showing of such unlawful combination, the court may admit the acts and statements of an alleged co-conspirator as evidence against the party on trial, but the admission of such evidence is not conclusive of the existence of the conspiracy, and it is the court's duty to instruct the jury that, unless they find the conspiracy has been proven, the testimony as to the acts and statements of the third party must be eliminated from their consideration in reaching their verdict: 2 McClain, Criminal Law, 989; *Loggins* v. *State,* 12 Tex. App. 65. We think, therefore, that the preliminary decision by the court goes simply to the admissibility of the evidence, and that the jury is not only at liberty, but is bound to take into consideration all the testimony bearing upon the character of the alleged dying declaration, and the circumstances under which it was made; and, furthermore, that, in view of the peculiar and exceptional nature of such evidence, and the care with which the court restricts its admission and consideration, the jury should have explicit instruction in the premises."

4. Applying these principles here, the State offered testimony tending to show that the alleged declaration was made under a sense of impending death, after which the declaration was admitted in evidence. But to enable the jury fairly and properly to determine its weight and credibility, testimony as to all circumstances bearing upon, and immediately connected with its execution, including all statements made at the time to and by the decedent as to his condition, and by him as to his sense thereof, as well as anything tending to throw light upon the motive prompting him to make a statement, should have been admitted and submitted to the jury for their consideration. To hold otherwise would be to permit the opinion of the court upon one of the vital issues to

be conclusive upon the jury; and notwithstanding the circumstances and influences surrounding the deceased at the time of making the declaration, including the conflict of testimony, might make it ever so questionable, such rule, if recognized, would make it incumbent upon the jury to find that the declarant was *in extremis* and acting under a sense of impending death, and to give the same weight and credit to his statements as if he were living, and without cross-examination had, under cath, made the recital attributed to him.

"Whether the declaration," say the court in *People* v. *Thompson,* 145 Cal. 717, 724 (79 Pac. 435, 437), "was in fact made under a sense of impending death, is a question that most materially affects the question as to its credibility, and the determination of the court thereon is not conclusive upon the jury. They have the right, in considering whether they shall accept the declaration as a correct statement, to determine for themselves whether the declarant was *in extremis,* and fully convinced of that fact when making the declaration, and are at liberty to disregard it, if not satisfied that it was made under a sense of impending death."

The court, after further observations to the above effect, through Mr. Justice HOLMES, in *Commonwealth* v. *Brewer,* 164 Mass. 577, 582 (42 N. E. 92, 94), say:

"When the admissibility of evidence depends upon a collateral fact, the regular course is for the judge to pass upon the fact in the first instance, and then, if he admits the evidence, to instruct the jury to exclude it if they should be of different opinion on the preliminary matter."

See, also, 1 Greenleaf, Evidence (14 ed.), § 160; Gillette, Indirect & Collateral Evidence, § 203; 1 McClain, Criminal Law, § 430; *Findley* v. *State,* 125 Ga. 579 (54 S. E. 106); *Carter* v. *State,* 2 Ga. App. 254 (58 S. E. 532); *State* v. *Phillips,* 118 Iowa, 660 (92 N. W. 876); *Starkey* v. *People,* 17 Ill. 17; *Nordgren* v. *People,* 211 Ill. 425 (71 N. E. 1042); *State* v. *Reed,* 53 Kan. 767 (37 Pac. 174: 42 Am. St. Rep. 322); *Martin*

v. *State,* 17 Ohio Cir. Ct. R. 406: 9 O. C. D. 621; *State* v. *Bannister,* 35 S. C. 290 (14 S. E. 678) ; *Walker* v. *State,* 37 Tex. 366; *State* v. *Eddon,* 8 Wash. 292 (36 Pac. 139).

5. The question as here presented has not heretofore been squarely before this court. In *State* v. *Foot You,* 24 Or. 61, 66 (32 Pac. 1031, 1032: 33 Pac. 537), Mr. Justice BEAN, in speaking for the court, says: "The competency of dying declarations is a matter for the court to determine, but after they have been admitted their weight and credibility become questions of fact for the jury, and they are entitled to such weight only as the jury may, under all the circumstances of the case, think proper to give them." The question there under consideration related only to the admissibility in the first instance of the statements obtained by questions propounded to declarant, on his death bed, by the counsel for the prosecution, without cross-examination, as to which the court held that, while not sufficient to exclude the declaration, they were all matters affecting the credibility and weight, and were for the consideration of the jury. In *Wilson* v. *United States,* 162 U. S. 613 (16 Sup. Ct. 895: 40 L. Ed. 1090), Mr. Chief Justice FULLER, in passing on the question as to whether the admissions there under consideration were made under such circumstances as to entitle them to consideration, says: "These were matters which went to the weight or credibility of what he said. * * * " So in the case at bar the circumstances surrounding the making of the declaration, and the point as to whether it was made under a sense of impending death, were questions of vital importance, a knowledge of which was essential to a proper determination by the jury of the effect, weight, and credit to be given to the statements of declarant, and unless the jury believed that it was so made, it became their duty to disregard the purported dying declaration and reach their conclusion from other testimony before them. But the instruction

given on the subject assumes and, in effect, conveys to the jury as an indisputable fact that the declarant was *in extremis* and under a full sense of impending death in every respect, and that his declaration was made while he was in such a frame of mind as to entitle his statement to full consideration as a dying declaration, and that the same weight should be given his statements as might be given to other evidence in the case. It is clear that the proof offered by the defense bearing on the points considered should have been admitted; that the instruction requested, or one of similar import, should have been given; and that the instruction as given is erroneous.

6. Since the cause must be remanded for retrial, it is important that other errors urged should be considered. In the statement of deceased, admitted in evidence over defendant's objections as to its compentency and materiality, there was included the following: "I never had any trouble with him before," and the words "I have no gun and do not own one," and the statement signed by S. P. Crow, added to the declaration: "After reading the paper, Mr. Sim requested to add that just before he called him a d——d liar he turned away and said, "Oh, it doesn't amount to anything any way, and there is no harm done.' " This last statement was further objected to, for the reason that it was not signed by deceased. Dying declarations are admitted as an evident exception to the rule that hearsay evidence is inadmissible and must be confined to the circumstances immediately connected with the fatal injury, from which it follows that the admission of the first of these statements was improper: 4 Ency. Ev. 1005; Gillette, Indirect & Collateral Evidence, § 198; *Savage et al.* v. *State,* 18 Fla. 909; *State* v. *Perigo,* 80 Iowa, 37 (45 N. W. 399) ; *State* v. *O'Shea,* 60 Kan. 772 (57 Pac. 970) ; *Goodall* v. *State,* 1 Or. 333 (80 Am. Dec. 396) ; *State* v. *Eddon,* 8 Wash. 292 (36 Pac. 139). When it is remem-

bered that the defendant is deprived of being brought face to face with the witness and of the benefits of cross-examination, and his statements are admitted without reference to the form of the questions to which they are responsive, which, in many instances, are leading as well as misleading to one in a weakened and dying condition, the protection of the liberties of the innocent, as well as in many cases the conviction of the guilty, demands that statements admitted under such circumstances be limited to the *res gestae,* and that the deceased be permitted to speak only of the transactions causing the death, with such accompanying statements and conduct as may throw light upon it. This appears to be the limitation prescribed by Section 718, subd. 4, B. & C. Comp., which provides that evidence may be given on the trial of the "declaration or act of a dying person, made or done under a sense of impending death, respecting the cause of his death."

7. The same may be said with reference to decedent's assertion that he had no gun and never carried one. This statement was made after the shooting, and as stated in *State* v. *Eddon,* 8 Wash. 292 (36 Pac. 139), it is in the nature of obtaining testimony to the effect that he was not armed at the time of the tragedy. In *State* v. *Eddon* defendant was found guilty of manslaughter. The declaration admitted in evidence contained a paragraph designated as the "last portion of the statement," as follows:

"After he was shot he put his hand back and thought he could feel the bullet or something back—put his hand back to see what it was, and at that, I believe, he fell or settled to the ground; that after he had settled to the ground he called his hired man that was near by, and Mr. Carleton examined him to see if he was unarmed."

The court, in passing upon the point, states: "This last portion of the statement we think was inadmissible, as it was no part of the *res gestae,* and we do not think

the statement of what he did after the shooting, which was in the nature of competent testimony that he was not armed at the time of the difficulty, should have been allowed under any authority as a part of the dying declaration, for the admission of dying declarations in cases of homicide, as thus formulated by 1 Greenleaf, Evidence, § 156: 'The death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declaration.' "

8. The remark quoted by declarant as having been made at the time of the affray and reported in the appended memorandum signed by S. P. Crow, was a part of the *res gestae*, and, as such, would be admitted, since it appears that this statement by declarant can be shown by the testimony of those hearing his recital thereof at the time of making his purported dying declaration, but should not be admitted as a part of declarant's written statement. It is admissible in the same manner and under the same conditions as would any oral declaration of the declarant, as testified to by those hearing it. But since this would leave the dying declaration partly verbal and partly written, the question as to whether both should be admitted is important. The authorities are in conflict as to whether declarations partly oral and partly written may be admitted in evidence, some holding that, if a written declaration is relied upon, additional oral statements are inadmissible, while others take the opposite view. In a very recent case (*Kirby* v. *State* [Ala.], 44 South. 38) the court, without discussing the question, held both competent, and this rule is announced in *State* v. *Schmidt,* 73 Iowa, 469, 475 (35 N. W. 590).

9. We are also of the opinion, that when all the statements are made under a sense of impending death, and on the same occasion, no good reason can be advanced why both should not be admissible, if otherwise competent. In order, however, that undue prominence may

not be given to the contents of the written statement over the oral, the written declarations should not be taken to the jury box, and only such portions thereof as may be deemed material and competent should be read to the jury, thereby placing the written statements on an equality with the testimony relating to the oral statements of the declarant.

10. The statement in the instruction as given, to the effect that the declaration of the deceased should be considered, and is entitled to the same weight as any other evidence offered, is too broad, and is subject to qualification. It would have been proper to have instructed the jury to the effect that, if they determine that the declarant was *in extremis* and the declaration was made under full belief of impending death, they may give the statements the same weight as they would if the declarant were living and made the statements attributed to him, or had given testimony of similar import, under oath, from the witness stand, without cross-examination thereon, proper consideration being given and due allowance being made to all circumstances surrounding the declarant when the statement was made, together with his physical as well as mental condition, including any apparent influence, if any, under which he might have been laboring at the time. As stated in *State* v. *Vansant*, 80 Mo. 67:

"Dying declarations are in their nature secondary evidence, and are so regarded in the law. It is, therefore, error to instruct a jury to give them the same weight they would if the declarant had testified before them."

It is true there is a line of authorities under which the instruction of the court below could be sustained, but the weight of modern authority holds to what we believe to be the better rule, as indicated: Wharton, Criminal Ev. § 276; Kerr, Law of Homicide, § 415; Gillette, Indirect & Collateral Evidence, § 203; *Nordgren*

v. *People,* 211 Ill. 425 (71 N. E. 1042) ; *State* v. *Mathes,* 90 Mo. 571 (2 S. W. 800) ; *State* v. *Eddon,* 8 Wash. 292 (36 Pac. 139).

12. The defendant was asked what, if any reason he had at the time the deceased attempted to strike him, to think that he was in danger of receiving great bodily harm, and as to why he thought he had to be armed for his own protection, which, on objection, was refused. Counsel for the defense then stated that he expected to prove:

-"That the witness had been assaulted by another man about the size of Sim, and of his apparent physical power a short time before that; that this other person with his fists alone, had maimed the witness by striking him in the face and breaking his nose, so that he was and always will be maimed and disfigured in a serious way, and that when the deceased started towards him with his fists, together with the action and conduct of Sim and his size, made him fear and believe that he was in danger of being maimed in a similar manner, and of suffering great bodily harm at the hands of the deceased; that the previous assault had been entirely unprovoked upon his part and arose about a very trifling matter; that defendant had not armed himself for the purpose of this affray, but that he had carried the pistol ever since he was assaulted by this other man for the purpose of self-defense."

As bearing on this point, the defense, at the proper time, requested, but was refused, the following instruction:

"If you believe that the defendant had been previously assaulted and maimed by a man larger than him who was assaulting him with his fists alone, and who had thus broken his nose and maimed and disfigured him for life, you have a right to take that into consideration in coming to a conclusion as to whether or not the defendant believed himself in danger of such maiming and disfigurement when assaulted by the deceased."

The theory of the defense appears to be that when the defendant was assaulted by the deceased he drew

the weapon with the intention of preventing, by its dis-
play, great bodily harm, and not for the purpose of
shooting, and that its discharge was accidental, and some
testimony was introduced in support of this position.
As the intent is one of the elements necessary to be
shown to constitute the crime for which defendant was
convicted, the fact that he was armed on the occasion,
and that the State at the trial was attempting to show
that he started the trouble with the intention of com-
mitting the homicide, thereby becoming the aggressor,
the question as to why he was in possession of the
weapon on the occasion became material.  If he never
carried a weapon until he called upon Sim for the expla-
nation testified to, this would be a strong circumstance
in support of the State's position, as would also the fact
if true, that he was in the habit of carrying dangerous
weapons without any substantial reason for so doing.
Concerning the relative size and strength of the parties
in a personal conflict, this court, in *State* v. *Gray,* 43 Or.
446, 455 (74 Pac. 927, 930), say:

"A strong, powerful man, with his fists alone, is
capable of visiting great physical injury upon his victim
much his inferior in strength or endurance, and he may
even thus take his life.  Instances are not wanting
where such results have followed."

In the case under consideration the testimony points
to the alleged fact that the deceased was a man capable
of inflicting great bodily harm upon the defendant, and
when an effort was made to show that defendant had
but a short time before been assaulted by a person of
like physique and strength, who had severely injured
and maimed him, these facts, if true, when coupled with
the appearances then confronting him, might furnish
reasons upon which an ordinarily reasonable and pru-
dent man of the size and strength of the accused, placed
in a similar position, might be justified in inferring that
he was in immediate danger of great bodily harm.  It

was competent, therefore, for the purpose of determining who was the aggressor, as well as to show the degree of defendant's apprehensions at the time of the affray: 6 Ency. Ev. pp. 767, 771. The defendant was therefore entitled to disclose any incident directly bearing upon the motive prompting him to carry arms, and under which he was acting in drawing the revolver. If he was armed as a result of previous difficulties, different inferences could be drawn than if the converse were true. And if it appears that he was previously assaulted and maimed by one similar in size and weight to that of the deceased, without being the aggressor, and suffered great bodily injury thereby, the knowledge of that fact became important in enabling the jury to determine how he happened to be carrying a revolver when this trouble took place, and as to whether the circumstances were such that defendant, as an ordinarily prudent and cautious man, had reason to apprehend the loss of life or great bodily harm, and as to whether defendant, when he drew his revolver, honestly believed he was in imminent danger.

13. As stated by Mr. Justice WOLVERTON, in *State* v. *Gray,* 43 Or. 446, 455 (74 Pac. 927, 930) :

"The question as to the degree of danger attending the assault is one for the jury, they putting themselves in the place of the assailed, and acting as reasonable men upon the conditions as they appeared to have existed": 1 Bishop, Criminal Law, § 874; Wharton, Criminal Law (8 ed.), 490; *State* v. *Miller,* 43 Or. 325 (74 Pac. 658).

For illustration, if a person had been held up by a highwayman and robbed, and, fearing a repetition thereof, found it necessary to go armed, and while carrying a weapon for this purpose should have trouble with a neighbor, resulting in a homicide, and in order to show him to be the aggressor, it was sought to be shown that he had armed himself, seeking the difficulty, it could hardly be questioned but that he should be permitted to show the happening of the event by reason of which

he was carrying a revolver. The jury were therefore entitled to everything which could reasonably be presented and fairly affect the judgment of reasonable men in passing upon like questions, and in that respect an ideal man cannot safely be taken as a model by which every defendant charged with a crime must be judged. It must be made to depend, not necessarily upon what the common experiences of men should be in such instances, but upon what they are: Wharton, Criminal Law (9 ed.), §§ 490, 1192. The testimony offered should have been admitted concerning which an instruction of similar import to that requested should have been given: *Oliver* v. *State,* 11 Neb. 1 (7 N. W. 444).

14. After the defendant had offered evidence tending to prove his good character, one of the witnesses testifying in his behalf was asked:

"Q. You had heard of his [defendant] having trouble at Lostine with Sam Wade, did you?

A. Yes.

Q. You had heard of his having trouble with Robert Mays, did you?

A. Yes."

On redirect examination he was asked:

"Q. State just what it was that you heard as to the trouble with Mays and Wade that counsel has asked you about?"

To which an objection by the State was sustained Since the defendant was attempting to "supplement the presumption of his innocence" by testimony relative to his general reputation, the questions on cross-examination as to rumors of particular instances of having had trouble with others were permissible: 3 Ency. Ev. pp. 49-50; *State* v. *Ogden,* 39 Or. 195 (65 Pac. 449). But the extent to which counsel may go in this respect depends largely upon the facts in each case, and is within the discretion of the trial court, subject to review only for an abuse thereof: 3 Ency. Ev. pp. 49-50; *Randall* v. *State,* 132 Ind. 539, 542 (32 N. E. 305).

15. In a recent work on evidence (Wigmore, Evidence, § 988, p. 1145), in criticising the rule admitting rumors of this nature, this eminent author urges, as one of the strong objections thereto, that "it leaves the other person no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue." As a deduction from the reasoning of this author, it would seem that since this court, in *State* v. *Ogden,* 39 Or. 195 (65 Pac. 449), recognizes the right of inquiry, on cross-examination, as to knowledge of facts in this respect, the permitting of such inquiry necessarily creates an issue concerning which further sifting may be proper and essential by the person whose character is by this specific means brought in question. The unexplained responses given to the cross-interrogatories, in addition to having the tendency of testing the knowledge and accuracy of the witness, also tended to prove the defendant to be of a quarrelsome disposition, thereby having a material bearing upon whether he was the aggressor on the occasion. He was therefore entitled, if he desired, to have the facts presented to the jury to show the general nature of such troubles, and, if true, that he was not the aggressor, or that he did not actively participate therein.

16. In other words, since counsel for the State chose, on cross-examination, to develop and bring out the specific incidents of the bearing indicated, defendant, as a result thereof, was entitled further to inquire into the rumors elicited, and thus place the facts before the jury in what he may consider the true light: *Olive* v. *State,* 11 Neb. 1, 27 (7 N. W. 444) ; Wigmore, Evidence, § 195. Nor does it follow that permission to open up this investigation necessarily entitles plaintiff on recross-examination to probe further into the rumors, or otherwise to show the causes leading up to the difficulty. However, notwithstanding the refusal to permit the

defense, on redirect examination, to have the witness explain all he had heard concerning the rumors disclosed in his response to the cross-interrogatories, the court permitted the State, over the protest of the defense, to ask the witness on recross-examination: "Didn't you hear, in connection with your admission that you had heard that defendant had trouble with Mays and Wade, that the origin of that trouble was scurrilous newspaper articles that the defendant had published concerning them? Answer, 'Yes' or 'No' "—to which the witness answered in the affirmative. In view of the limitation placed upon inquiries of this character, even as first admitted in this direction, as well as criticism thereof, by recent and eminent authorities on the subject (Wigmore, Evidence, § 195; 3 Ency. Ev. pp. 49-50), we believe that a further extension in this direction should not be encouraged, and especially that it cannot be justified under the circumstances to which our attention is here directed. The line must be drawn somewhere, but at what point it is difficult of determination. It is one as to which a fixed rule cannot be established, but must be left to the determination of the trial court, under the facts and circumstances surrounding cases, as they may arise, subject to review only for an abuse of discretion: 3 Ency. Ev. p. 49. For example, the State was permitted, on cross-examination, to inquire into special incidents tending to rebut the testimony as to defendant's good character. The rule allowing this inquiry makes it necessary that the opposition then be permitted to disclose the circumstances surrounding the rumored special conflicts of the accused with others, and to show whether he was the aggressor on the occasions thus specified, together with such incidents immediately connected with it as might be necessary for its proper understanding. But this, for the reasons given, does not necessarily open up the question so as to permit inquiry on recross-examination, or otherwise, into still further

rumors and more remote circumstances and collateral incidents for the possible bearing they might have on the subject, especially to allow an inquiry where, as on this occasion, the court did not permit the defendant to go into these questions in response to the information elicited in that direction by the State. For instance, the State had shown on cross-examination of the witness as to defendant's character that he had heard of defendant having had trouble on two previous occasions with persons designated. The defendant was denied the right to show by the witness that on the special occasions alluded to, defendant was assaulted by the parties designated, without any attempt on his part to resent the attack, and without provocation on his part. Notwithstanding this refusal, the State was then permitted to show that it was reported that these assaults were brought about by "scurrilous newspaper attacks," etc. The action of the court in this respect was clearly prejudicial to defendant, and should not have been allowed.

17. Another error complained of was the refusal of the court to permit defendant to show that about three weeks prior to the shooting, the deceased made threats of a serious nature against the defendant. It is maintained that because these threats were not communicated, they were not admissible in evidence. It was only claimed for them that they were offered for the purpose of showing the decedent was the aggressor, and the evidence admitted was such that it necessarily became a question for the jury to determine who was the aggressor, and for this purpose the testimony offered, but excluded, on this point, was admissible: *State* v. *Tarter,* 26 Or. 38 (37 Pac. 53); *State* v. *Thompson,* 49 Or. 46 (88 Pac. 583); *Warford* v. *People,* 41 Col. 203 (92 Pac. 24); *Wiggins* v. *People,* 93 U. S. (3 Otto) 465 (23 L. Ed. 941).

It is also maintained that the court erred in its instructions to the jury to the effect that defendant could

not invoke the law of self-defense unless shown to be
free from fault and that he did not provoke the difficulty.
The points urged in this respect are included in assign-
ments of error 22 to 30, inclusive.    It, therefore, becomes
important to determine whether abusive language used
by one accused of a homicide, necessarily deprives him of
the protection of the law of self-defense.    The State con-
tends that the court below is supported on this point by
the principles announced in *State* v. *Gray,* 43 Or. 446
(74 Pac. 927).    We are of the opinion that *State* v. *Gray*
does not go to the extent claimed for it in this respect.
There the evidence on the part of the State tended to
show that the defendant had used the most gross and
persistent abuse towards the deceased without apparent
cause, at the same time intimidating him with a revolver,
and his conduct was such as clearly to indicate that he
made this abuse and attempted intimidation of the per-
son there killed, for the purpose of provoking an assault.
Defendant made no attempt in that case to have the
court define what would constitute the provoking of an
assault, and it, strictly speaking, had reference to the
seeking of the difficulty; while in the case before us the
claim that defendant was not seeking an affray, and
that he made no attempt to intimidate decedent, was
relied upon as a part of the defense, and there was some
evidence tending, at least sufficient for the jury's consid-
eration, to show that the defendant may not, by calling
upon decedent, have contemplated anything further than
to straighten out the misunderstanding between them.
In *People* v. *Thompson,* 145 Cal. 717, 721 (79 Pac. 435,
436), the court, in discussing this feature there involved,
observes:

"In either event the mere fact that the parties are
engaged in a sudden quarrel, which may be a mere alter-
cation of words, cannot deprive one of the right to
defend himself against the real or apparent assailant."

And in *State* v. *Perigo,* 70 Iowa, 657, 665 (28 N. W.
452, 456), the court say:

"If defendant did not make the statement attributed to him with the intention of provoking the assault, but deceased was induced by it to make it, he might lawfully defend himself against it, even to the extent of taking the life of the assailant, if that reasonably seemed to be necessary for the preservation of his own life, or the protection of his person from great injury."

18. And in *State* v. *Taylor*, 57 W. Va. 228 (50 S. E. 251), after mentioning that the trial court had told the jury that defendant could not justify the killing if he had brought on or begun the difficulty, although with no intent to kill or do bodily injury to the deceased, the court observes that this instruction "should have been refused. A man does not lose his right of self-defense unless he has done some wrongful act. Mere innocent or accidental cause of difficulty or combat permitted by this instruction is not enough." We do not think the mere words and acts alone of defendant, as disclosed by the testimony in the record, are sufficient to necessarily preclude him from the right of self-defense. The weight of authority indicates that merely offensive words springing naturally from the accused while engaged in a quarrel are insufficient to deprive such person of the right of self-defense, unless accompanied by circumstances clearly showing an intent on his part to provoke some kind of an affray. Where different deductions may be drawn from the testimony as to the effect of the language used and of the intention under such circumstances, the question should, under proper instructions, be submitted to the jury.

19. The evidence discloses that defendant, at the time of the trouble, was armed with a revolver, which he was carrying in his pocket, this having been his custom for some time past. This, in itself, under our statute, constitutes a misdemeanor, concerning which defendant requested the court to instruct the jury to the effect that, if they found from the evidence that defendant had for a long time carried a pistol and had it on his person at

the time of the homicide, in pursuance of his usual custom and without any reference to the deceased, the fact that he had the pistol, whether rightfully or wrongfully, ought not to prejudice them in any way in the trial of the case, and that defendant was not on trial for carrying the pistol, whether rightfully or wrongfully, and that they had no right to consider that fact against him in any way, except as it may bear upon his conduct in the affray, and that the mere fact that a man is armed at the time of the affray does not necessarily take away or lessen his right of self-defense.    This instruction was refused by the court.

20. The mere fact that a person may be armed is no offense under the statute (B. & C. Comp. § 3281) ; but such arms, when carried in a concealed manner, is a misdemeanor.   In other words, it is not the being possessed of arms that constitutes the offense, but the manner thereof.   But whether the weapon was concealed or not, to hold that the mere fact that a person accused of a homicide was armed at the time, and that because of the misdemeanor resulting therefrom, he shall be deprived of any right of self-defense, would lead to the absurd and unjust consequence in practically all cases of depriving the accused of any defense, whether such person is in the right or wrong, and whether his acts were necessary to save his life or to avoid receiving great bodily injury or not.

21. The jury had a right to take into consideration the fact that the defendant was carrying a pistol at the time only in so far as that incident was connected with the homicide.   For instance, they might consider it so far as it has any bearing on the question as to whether the defendant was the aggressor, or, where the question of premeditation is in issue, whether he went there armed with the intention of slaying the deceased, together with any explanations which he may have offered as to how he happened to be armed on the occasion.

Since the defendant was entitled to such instructions as would fairly present his theory of the case under the evidence (*State* v. *Teller,* 45 Or. 571: 78 Pac. 980), instructions sufficient to make these points clear should have been given.

The errors indicated make a reversal of the judgment of the circuit court and the granting of a new trial necessary.          REVERSED.

Decided March 10, 1908.